# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SCHNEIDER NATIONAL CARRIERS, INC., | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. N21C-10-157-PAF |
| | ) | |
| RAYMOND J. KUNTZ, as Sellers' | ) | |
| Representative for RAYMOND J. KUNTZ and | ) | |
| STEVE B. WILLIAMSON, | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |

## MEMORANDUM OPINION

Date Submitted: February 16, 2022
Date Decided: April 25, 2022

Michael A. Pittenger, Kelly L. Henry, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Locke Beatty, MCGUIREWOODS LLP, Charlotte, North Carolina; *Attorneys for Plaintiff and Counterclaim Defendant Schneider National Carriers, Inc.*

John M. Seaman, Matthew L. Miller, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Anthony S. Fiotto, MORRISON & FOERSTER LLP, Boston, Massachusetts; *Attorneys for Defendant and Counterclaim Plaintiff Raymond J. Kuntz, in his capacity as Sellers' Representative for Raymond J. Kuntz and Steve B. Williamson.*

**FIORAVANTI, Vice Chancellor**\*

---

\* Sitting by designation pursuant to Del. Const. art. IV, § 13(2).

This breach of contract case involves the purchase of a group of trucking companies. The contract contained covenants governing the buyer's operation of the acquired companies after the closing of the transaction. The buyer's breach of any one of those covenants would require the buyer to pay $40 million to the sellers. One of those covenants, and the main focus of disagreement, required the buyer to "cause one or more of the Acquired Companies to acquire, in the aggregate, not less than sixty (60) class 8 tractors" every year for three years after the acquisition. The buyer contends this covenant only required the buyer to acquire at least 60 tractors per year across all of the acquired companies, which the buyer undisputedly did. The sellers contend the covenant required the buyer to expand the acquired companies' fleet of tractors by at least 60 tractors per year, which the buyer undisputedly did not do.

This case was originally filed in the Court of Chancery, where the court previously denied the parties' cross-motions for judgment on the pleadings and later for summary judgment, having determined that the covenants at issue are ambiguous. Following trial, but before decision, the Court of Chancery questioned whether it had subject matter jurisdiction over this case. The case was then transferred to the Superior Court and the undersigned was designated to sit on the Superior Court for the purpose of deciding all issues in the case.

In this post-trial opinion, the court agrees with the sellers that the stock purchase agreement required the buyer to grow the fleet by 60 class 8 tractors per year. Therefore, the sellers have established their claim for breach of contract and are entitled to contract damages of $40 million. The sellers have not satisfied their burden of proof on their remaining claims for breach of contract as to the other remaining operating covenants or breach of the implied covenant of good faith and fair dealing. The sellers are also entitled to their reasonable attorneys' fees and expenses under the indemnification provision of the stock purchase agreement.

## I.    BACKGROUND

The following recitation reflects the facts as the court finds them after trial.[1]

### A.    The Stock Purchase Agreement

Plaintiff and Counterclaim Defendant Schneider National Carriers, Inc. ("Schneider") is a transportation company headquartered in Green Bay, Wisconsin.[2] Watkins & Shepard, LLC ("W&S") was a Montana-based trucking company

---

[1] The trial testimony is cited as "Tr."; deposition testimony is cited as "Dep."; trial exhibits are cited as "JX"; and stipulated facts in the pre-trial order are cited as "PTO," with each followed by the relevant section, page, paragraph, or exhibit number. Documents filed on the Court of Chancery docket (C.A. No. 2017-0711-PAF) for this case are cited as "Ct. Ch. Dkt." followed by their docket number. Documents filed on the Superior Court docket (C.A. No. N21C-10-157-PAF) are cited as "Super. Ct. Dkt." followed by their docket number.

[2] PTO, III ¶ 1.

established in 1974.[3]  Raymond J. Kuntz and Steve B. Williamson (the "Sellers") are the former principal stockholders of W&S.[4]  Kuntz served as the Chief Executive Officer of W&S.[5]

On June 1, 2016, Schneider acquired W&S and its subsidiaries, Watkins & Shepard Leasing, LLC, and Lodeso, Inc. (collectively, the "Acquired Companies"), from the Sellers pursuant to a Stock Purchase Agreement (the "SPA").  For tax and liability reasons, Watkins & Shepard Leasing, LLC owned W&S's fleet of tractors and leased the tractors to W&S.[6]  Lodeso, Inc. was a Michigan-based logistics company engaged in the business of contracting with agents or independent contractors to arrange for final-mile delivery, and did not itself own any trucks.[7]  Defendant and Counterclaim Plaintiff Kuntz is the designated Sellers' Representative in the SPA.  Kuntz was to remain with W&S after the closing of the transaction, consulting with Schneider on integrating W&S and applying his

---

[3] *Id.*  At the time of the transaction, Schneider was a Nevada corporation, and W&S was a Montana corporation.  JX 108.00006.

[4] PTO, III ¶ 2.

[5] Tr. 9:18–22 (Kuntz).

[6] *Id.* at 45:12–24 (Kuntz).

[7] *Id.* at 41:8–42:5 (Kuntz).

3

expertise to Schneider's business.[8] Kuntz eventually resigned from his role following Schneider's purchase of the Acquired Companies.[9]

Under the SPA, the aggregate purchase price for W&S was set between $128,750,000 and $168,750,000. The purchase price contained three elements. First, the parties agreed to a non-contingent closing payment of $68,750,000 (less certain specified sums) to be made at closing on June 1, 2016. Second, the parties agreed to three, non-contingent, deferred consideration payments totaling $60,000,000, payable in three increments of $20,000,000 (less certain specified sums) with each payment being due following each of the first three anniversaries of the closing date. Third, and central to this dispute, the parties agreed to the possibility of three additional payments totaling a maximum of $40,000,000 (the "Earnout Payments"). The Earnout Payments would be payable in three increments of up to $13,333,333.33, if the Acquired Companies generated enough earnings before interest, taxes, depreciation, and amortization or "EBITDA" (the "EBITDA Targets") during three successive periods (each being a "Measurement Period").[10]

The first Measurement Period ran from July 1, 2016 to June 30, 2017, with an EBITDA Target of $36,000,000.[11] The second Measurement Period ran from July

---

[8] *Id.* at 99, 169–70 (Kuntz); *id.* at 650–53 (Rourke); *id.* at 988–89 (Elkins); *see* JX 173.

[9] Tr. 653:4–7 (Rourke).

[10] PTO, III ¶ 5.

[11] *Id.* ¶ 7.

1, 2017 to June 30, 2018, with an EBITDA Target of $46,000,000.[12] The third Measurement Period ran from July 1, 2018 to June 30, 2019, with an EBITDA Target of $59,000,000.[13] The EBITDA Targets were set based on Sellers' pre-acquisition financial projections.[14]

As to be expected, the Sellers wanted to maximize the prospects of achieving the Earnout Payments. Schneider, on the other hand, wanted flexibility in operating its newly Acquired Companies and integrating them into Schneider's overall business. To that end, Section 2.4(e) of the SPA provides that, after the transaction, Schneider, the Acquired Companies, and their affiliates would have the right to operate the businesses "as they see fit," subject to certain operating covenants in Exhibit E to the SPA. Section 2.4(e) states that "there is no guarantee of any [Earnout Payment]" and that Schneider "is not making nor has it made any

---

[12] *Id.* ¶ 8.

[13] *Id.* ¶ 9.

[14] *Id.* ¶ 6.

representation or warranty to such Seller . . . as to the value to such Seller of the potential right to receive any [Earnout Payment]."[15]

Sellers negotiated limitations on Schneider's operational freedom, which are reflected in four operating covenants (the "Operating Covenants"). The Operating Covenants are contained in Exhibit E to the SPA. Paragraph 1 to Exhibit E states that Schneider must, during each Measurement Period, "cause one or more of the Acquired Companies to acquire, in the aggregate, not less than sixty (60) class 8 tractors" (the "Tractor Acquisition Covenant").[16]

---

[15] JX 108 ("SPA") § 2.4(e). Section 2.4(e) states:

> During each Measurement Period, the Buyer shall operate the Acquired Companies and Lodeso in the manner provided for on **Exhibit E**. Each Seller acknowledges and agrees that (i) so long as the Buyer operates the Acquired Companies and Lodeso in such manner, the Buyer, the Acquired Companies and each of their respective Affiliates will have the right to otherwise operate their business as they see fit and will have no obligation (fiduciary or otherwise) to act in any manner in an attempt to protect or maximize any payments under this **Section 2.4**, (ii) any [Earnout Payment] is contingent on the performance of the business of the Acquired Companies, and there is no guarantee of any [Earnout Payment] . . . under this Agreement or otherwise; and (iii) the Buyer is not making nor has it made any representation or warranty to such Seller, and the Buyer expresses no opinion, as to the value to such Seller of the potential right to receive any [Earnout Payment].

[16] SPA, Ex. E. A class 8 tractor is considered a truck that is regularly seen hauling a 53-foot trailer on an interstate highway, whereas a class 7 tractor is smaller, and is normally used for what is called the "final mile" delivery. Tr. 43:2–16 (Kuntz). At trial, the parties used the terms "class 8 tractor" and "truck" interchangeably. Unless otherwise stated, the reference to "trucks" and "tractors" in this opinion refers to class 8 tractors.

6

Paragraph 2 to Exhibit E requires Schneider, during each Measurement Period, to "work in good faith . . . to seek to capture synergies available to the Acquired Companies" (the "Synergy Covenant").[17] The final paragraph in Exhibit E contains two covenants requiring Schneider to refrain from (1) transferring any material portion of the Acquired Companies' assets outside of the Acquired Companies (the "Material Asset Covenant"); and (2) materially changing the "type or nature" of any Acquired Company's business until the Measurement Periods ended (the "Business Continuity Covenant").[18]

In the event that Schneider violated any of the Operating Covenants, the Earnout Payments were to be collectively accelerated and due in full within five

---

[17] SPA, Ex. E. The Synergy Covenant, in full, requires Schneider to:

> work in good faith with the Acquired Companies to seek to capture synergies available to the Acquired Companies as a result of becoming a subsidiary of the Buyer and its Affiliates, such as, by way of representative example, fuel cost savings, tire cost savings, equipment cost savings, insurance savings and access to the Buyer's and its Affiliates' driver recruiting and management capabilities, safety initiatives and purchasing power.

[18] *Id.* In full, the final paragraph to Exhibit E states:

> In addition, except as the Buyer and Sellers' Representative may otherwise agree in writing, from the Closing Date through and including the last day of the final Measurement Period, the Buyer shall not, and shall not permit any of the Acquired Companies to reorganize, consolidate or otherwise take steps to sell, dispose or otherwise transfer any material portion of the assets of the Acquired Companies to an entity other than an Acquired Company or to materially alter or change the type or nature of any Acquired Company's business from the business conducted by the Acquired Companies immediately prior to the Closing.

7

business days of the failure to operate pursuant to any of the Operating Covenants (the "Acceleration Payment").[19]

### B.     The Negotiation of the SPA

#### 1.     W&S Seeks a Strategic Partner.

In 2013, W&S began expanding its service into delivering freight from stores engaged in e-commerce, including Costco.com.[20]  W&S grew to become the largest specialized carrier of furniture and the second largest specialized carrier of carpet in the United States.[21]  To accommodate the increased growth and achieve increased efficiencies, W&S built a truck terminal in Fontana, California, located closer to furniture shippers and manufacturers.[22]

Kuntz explained that trucking companies engaged in delivering freight for e-commerce customers have less time to conform their trucking fleet to the needs of those customers than for customers in other industries.  Traditionally, once a trucking company signs a contract to haul freight, there is sufficient lag time before the first delivery so as to enable the trucking company to acquire the necessary tractors and to hire drivers.[23]  According to Kuntz, e-commerce businesses, on the

---

[19] *Id.* § 2.4(f).

[20] Tr. 20:12–24 (Kuntz).

[21] *Id.* at 14:14–23 (Kuntz).

[22] *Id.* at 38:4–39:2 (Kuntz).

[23] *Id.* at 78:21–79:1 (Kuntz).

other hand, require companies like W&S to begin hauling their freight the day after a contract's signing.[24] Additionally, freight arriving from e-commerce businesses often arrives in variable quantities.[25] Therefore, it is imperative for trucking companies to have an appropriately sized tractor fleet immediately upon signing a contract with an e-commerce business.[26] W&S struggled to acquire trucks and hire drivers to keep up with the expansion and increasing demands of its e-commerce clients.[27] Kuntz, Kelly Darlington, W&S's operations manager,[28] and Richard Schenk, W&S's director of truckload operations,[29] each testified that W&S had difficulty purchasing enough trucks to accommodate the increased growth.[30]

In June 2015, W&S engaged a private equity firm, Cascadia Capital ("Cascadia"), to help W&S sell its business.[31] Schneider demonstrated interest in acquiring W&S, and Kuntz began negotiating with Schneider over the terms of that transaction. At the time, Schneider did not have any experience in handling the

---

[24] *Id.* at 79:1–11 (Kuntz).

[25] *Id.*

[26] *Id.*

[27] *Id.* at 20:10–24 (Kuntz) ("[W]e were constantly struggling to . . . get enough trucks. And so we could see, with the tremendous opportunity of e-commerce freight that we had in front of us, that we didn't have the capital to invest in enough equipment to keep up with it.").

[28] *Id.* at 347:2–5 (Darlington).

[29] *Id.* at 425:14–17 (Schenk).

[30] *Id.* at 350:18–351:21 (Darlington); *id.* at 429:8–23 (Schenk).

[31] *Id.* at 526:23–527:3 (Schiller).

9

delivery of furniture and carpeting.[32] Kuntz told Schneider's then-CEO, Chris Lofgren, that W&S "needed a capital partner to go forward" as a result of W&S's growth in e-commerce.[33]

### 2. Schneider and W&S Negotiate the Transaction and Discuss Acquiring Additional Equipment for W&S.

Cascadia prepared and delivered to Schneider a Confidential Information Memorandum (the "CIM") and Supplemental Financial Package ("SFP"). In December 2016, three Schneider executives—George Grossardt, Bob Elkins, and Michael Gasick held a conference call with Kuntz to discuss both documents.[34] Grossardt, Schneider's then-Senior Vice President of Corporate, led Schneider's deal team.[35] The SFP contained a slide entitled "Capital Expenditures Analysis," projecting that W&S would acquire 45 growth tractors (*i.e.*, new tractors to be added to grow the fleet, not to replace retired tractors) in 2016, 60 growth tractors in 2017, and 60 growth tractors in 2018.[36] Kuntz discussed with the Schneider executives on the December 2016 call the purchase of growth tractors, as described in the CIM.[37]

---

[32] *Id.* at 19:2–6 (Kuntz).

[33] *Id.* at 63:17–22 (Kuntz).

[34] *Id.* at 64:5–65:20 (Kuntz); *see* JX 9 (CIM); JX 16 (SFP).

[35] Tr. 756:12–24 (Gasick); *id.* at 612:2–7 (Rourke); *id.* at 534:20–22 (Schiller).

[36] JX 16.00005.

[37] Tr. 65:5–13 (Kuntz).

The CIM and the SFP projected that capital expenditures would be used both to replace existing tractors and to increase the overall fleet size.[38]

In January 2016, Kuntz discussed the prospective transaction with Grossardt, Gasick, and Elkins. Grossardt represented to Kuntz that Schneider could "provide [W&S] as many trucks as [Kuntz] wanted," and Grossardt and Elkins allayed Kuntz's fears that it would be difficult to find enough drivers.[39] In a follow-up email, Kuntz explained that "adding an additional 12 trucks per month after a transaction" would cause a "large increase in EBITA."[40] Grossardt responded to Kuntz, indicating that Schneider's "equipment life cycle" would require replacement of "about 200 tractors and 900 trailers immediately," which would be "over and above growth equipment that is already in your plan."[41]

W&S and Cascadia provided financial projections for W&S during the due diligence process.[42] Their projections assumed that W&S would acquire 60 growth tractors per year.[43] Schneider's internal documents consistently incorporated that

---

[38] JX 239; Tr. 61:3–62:4 (Kuntz).

[39] Tr. 70:14–71:10 (Kuntz).

[40] JX 22.

[41] *Id.*

[42] Tr. 734:13–21 (Gasick).

[43] JX 239 at Tab 2016 Budget p.3., Tab 2017 Projection p.3, Tab 2018 Projection p.3 (showing a 60 tractor per year increase: 630 tractors at the beginning of 2016, 690 at the beginning of 2017, 750 at the beginning of 2018, and 810 at the end of 2018).

11

assumption into its own analyses of the prospective transaction. Schneider's internal projections assumed that W&S would acquire 60 growth tractors per year.[44] A presentation to Schneider's board of directors in February 2016 states that "[g]rowth capex is assumed to be 60 tractors and 180 trailers per year" and that "60 growth tractors provides . . . $5M of EBITDA."[45] The assumption that W&S would acquire 60 growth tractors annually was then used in Schneider's own valuation calculations based on W&S's projections, even after those calculations were "modified for more reasonable assumptions."[46] Indeed, although he was unwilling to concede the issue, Mark Rourke, Schneider's then-COO and eventual CEO, testified that every projection that Schneider and W&S created relied on the assumption that W&S would acquire 60 growth tractors annually after the transaction.[47]

---

[44] JX 102.00040.

[45] JX 27.00002.

[46] JX 27.00003; Tr. 817:4–24 (Gasick).

[47] Tr. 670:7–672:13 (Rourke):

> Q. And you saw from reviewing [the CIM] that the plan that [W&S] had for obtaining its EBITDA targets was to grow the fleet. Correct?
>
> A. As well as a number of other items on that income statement. But yes.
>
> Q. And you understand that the strategy was to grow the fleet by 60 Class 8 tractors a year to attain those EBITDA targets. Correct?
>
> A. As well as the revenue that supports that, yes.
>
> . . .
>
> Q. The internal Schneider projections included a plan to grow the fleet by 60 additional Class 8 tractors; yes, sir?

### 3. The Letters of Intent

On March 7, 2016, Schneider sent W&S a non-binding letter of intent. Schneider proposed a purchase price of $145 million in guaranteed consideration and up to $30 million of Earnout Payments contingent upon W&S reaching certain EBITDA Targets.[48] The initial letter of intent contained EBITDA Targets of $36 million for one year after closing, $46 million for two years after closing, and $59 million for three years after closing.[49] The EBITDA Targets in the first letter of intent originated from W&S's projections.[50]

On March 14, 2016, Schneider sent W&S a revised letter of intent that contained certain "assumptions," including "[s]ufficient tractor and trailer capital to support profitable growth; a minimum of 60 tractors and sufficient trailers for each 12 month EBITDA Measurement Period."[51] In a subsequent draft of the letter of

---

A. We had a projection to grow the business, yes, 60 tractors.

Q. . . . [E]very single projection that Schneider received from [W&S] had the 60 tractor—or 60 Class 8 tractor growth a year plan, did it not?

A. . . . Yes.

Q. And, in fact, every projection and valuation document that Schneider did included that 60-tractor growth a year, did it not?

A. . . . [Y]es.

[48] JX 38.

[49] JX 38.00004.

[50] Tr. 762:21–763:6 (Gasick); PTO, III ¶ 6.

[51] JX 43.00004.

13

intent, Sellers' counsel added language indicating that the "Definitive Agreement will contain mutually agreeable operational covenants with the goal of optimizing the achievement of the EBITDA Targets," and requiring "[s]ufficient tractor and trailer capital to support profitable growth, including a minimum of 60 tractors and sufficient trailers for each 12 month EBITDA Measurement Period."[52]

On March 18, 2016, the parties executed a final letter of intent.[53] The final letter of intent provided for total consideration of $175 million, consisting of: (1) $85 million at closing, (2) three guaranteed payments of $20 million each year for three years after closing, and (3) three contingent payments of up to $10 million for achieving at least 80% of EBITDA targets of $36 million within 12 months after closing, $46 million within 24 months after closing, and $59 million within 36 months of closing.[54] The final letter of intent largely preserved the language regarding the acquisition of 60 growth tractors annually, stating that the "Definitive Agreement will contain mutually agreeable operational covenants, including but not limited to . . . . Sufficient tractor and trailer capital to support profitable growth; a minimum of 60 tractors and sufficient trailers for each 12 month EBITDA Measurement Period."[55] No one from Schneider informed W&S that the 60 tractors

---

[52] JX 45.00005.

[53] *See* JX 47.

[54] *Id.* at 47.00002.

[55] *Id.* at 47.00005.

referenced in the letter of intent were intended to be replacement tractors (*i.e.*, new tractors to be added to the fleet to replace retiring tractors).[56] In fact, Rourke testified that the reference to a "minimum of 60 tractors" in this letter of intent meant "60 additional growth capex tractors."[57]

Internal Schneider documents postdating the final letter of intent demonstrate that Schneider understood the agreement would require purchasing 60 growth tractors per year for W&S after the acquisition. A presentation in April 2016 to Schneider's board of directors stated that W&S's "[g]rowth opportunities are being hampered by [its] capability to acquire growth capital," and assessed the return on capital from an acquisition of W&S based on "60 tractors/180 trailers of growth assumed annually."[58] Schneider management also submitted a Hart-Scott-Rodino filing to the Federal Trade Commission, which included slides projecting future EBITDA based on the assumption that Schneider would add 60 growth tractors per year after the transaction.[59]

---

[56] Tr. 694:5–20 (Rourke).

[57] *Id.* at 679:10–18 (Rourke) ("Q. You understood when you signed this [letter of intent] that 60 tractors related to the 60 additional growth capex tractors, did you not? A. At the time, yes. Q. So that's the commitment in the [letter of intent]. Correct? A. At that portion of the process.").

[58] JX 64.00018, .00026.

[59] JX 286.00199; *see also* Kardish Sept. 27, 2019 Dep. 98:7–101:18. Kardish did not testify at trial.

### 4. The Parties Exchange the First Drafts of the SPA.

On April 8, 2016, Schneider sent the first draft of the SPA to the Sellers, which contained the same price terms as the final letter of intent.[60] The first draft of the SPA did not include any operating covenants or any provision obligating Schneider to purchase tractors.[61] The initial draft of the SPA permitted Schneider to operate the business "as [it saw] fit," without any "obligation (fiduciary or otherwise) to act in any manner in an attempt to protect or maximize" the Earnout Payments.[62]

On April 21, 2016, Sellers' counsel circulated a second draft of the SPA.[63] The Sellers' second draft requested that Schneider propose "post-closing operational covenants," including a covenant "to continue to operate the business on a stand-alone, independent basis" and a "covenant to provide appropriate equipment purchase support."[64] Kuntz's attorney, Jamie Hutchinson, testified that the request for a covenant to provide "appropriate equipment purchase support" was a reference to the provision in the letter of intent to increase the fleet size by 60 tractors every year.[65]

---

[60] *See* JX 56.

[61] *Id.* §§ 2.1–2.4.

[62] *Id.* § 2.4(e).

[63] *See* JX 65.

[64] JX 65.00026.

[65] Tr. 264:22–265:9 (Hutchinson).

16

## 5. The Parties Meet to Negotiate the Terms of the SPA.

On May 3, 2016, Rourke, Elkins, Grossardt, Kuntz, and Cascadia met in Green Bay, Wisconsin to discuss the transaction. The parties memorialized the meeting in a set of meeting notes.[66] According to the notes, the goal of the meeting was to "come away with a comprehensive understanding of all of the key deal points and issues and design an action plan/strategy to completing these open items."[67] After discussing various matters, including an environmental review of W&S's facilities, key employee agreements, and changes to accounting methods as a result of the acquisition, the parties turned to W&S's recent performance. In the first quarter of 2016, W&S missed its target EBITDA by almost 30%.[68] The Sellers, though, declined to offer revised projections. Christian Schiller, a managing director at Cascadia, believed the earnings miss was primarily attributable to "just a timing issue" along with hedge positions relating to fuel costs.[69] The contemporaneous notes of the Green Bay meeting state that Sellers concluded that they would "hold [their] position on valuation and there will be no retrade or valuation changes."[70]

---

[66] *See* JX 78.

[67] *Id.* at 78.00003.

[68] JX 68; Tr. 193:22–194:10 (Kuntz).

[69] Tr. 881:3–884:2 (Schiller).

[70] JX 78.00007.

The parties then negotiated the Earnout Payments. Under a heading entitled "Define and Simplify Earn Out," the notes state: "Ray [Kuntz] began this point with a statement . . . . We will start adding trucks."[71] Kuntz explained at trial that, at this time, W&S could not wait to begin purchasing growth tractors in order to meet its EBITDA Targets, "particularly before the fall e-commerce season really lit up."[72] The parties also discussed integration efforts, including that Schneider "would be worried about underutilization of the assets. I.E. adding assets before the revenue is there," because Schneider would "want to make sure there is good return on the assets."[73] Rourke testified that this statement was an expression of Schneider's business philosophy, because Schneider is not "capital constrained, and we have access to capital to place into the business to the degree that we're successful . . . . Not in advance of being successful, but as we're being successful."[74]

On May 10, 2016, Kuntz and Rourke continued to negotiate. Kuntz and Rourke agreed to reallocate money from the non-contingent closing payment into the Earnout Payments to account for risk associated with W&S's recent earnings misses.[75] Kuntz and Rourke's testimony differ regarding whether Kuntz discussed

---

[71] *Id.* at 78.00008.

[72] Tr. 114:9–19 (Kuntz).

[73] JX 78.00008.

[74] Tr. 625:3–626:5 (Rourke).

[75] JX 86; Tr. 118:3–22 (Kuntz); *id.* at 628:10–629:1 (Rourke).

18

the need for 60 additional tractors and drivers on this call. According to Kuntz, he told Rourke that he needed Rourke's "assurance" that the 60 tractors "in the LOI" would be provided to him.[76] Kuntz testified that Rourke responded by telling him, "We're an operations company. We hire drivers. That's what we do. We will provide you the drivers."[77] Rourke, on the other hand, testified that he did not recall agreeing to increase the fleet by 60 trucks each year during that call.[78]

Late that evening, Gasick sent Rourke, Grossardt, and Lori Lutey (Schneider's then-CFO) "a draft overview of the changes to the Buffalo deal from the original LoI terms."[79] The overview described three "changes to valuation and deal structure" that Rourke and Kuntz discussed, including shifting $10 million from the closing payment into the Earnout Payments.[80] The following morning, Rourke sent an email to Kuntz to follow up on their discussion.[81] The summary email detailed revised price terms, with a closing payment of $68.75 million and total compensation of $168.75 million, listing certain outstanding items and a target closing date. Kuntz

---

[76] Tr. 118:19–22 (Kuntz).

[77] *Id.* at 118:3–119:2 (Kuntz).

[78] *Id.* at 629:22–24 (Rourke) ("No. I don't recall doing that at all."). Rourke did recall discussing other issues during that call. *Id.* at 627:14–628:9, 629:2–17 (Rourke).

[79] JX 281.

[80] *Id.* at 281.00004.

[81] JX 86; Tr. 628:18–631:1 (Rourke).

agreed, stating that he "just brief[ed the] crew to get it done."[82]  Neither the overview nor the summary email addressed any operating covenants, including the purchase of 60 growth tractors annually.

On May 11, 2016, the parties held an "all hands" call involving many representatives from the parties and their counsel.[83]  Kuntz testified that he and Hutchinson "were adamant that we needed operational cover that would protect us [so] that we got the 60 additional trucks that Mark Rourke alluded to," and that Kuntz and Hutchinson were "adamant that [they] needed protection that [Schneider] just couldn't randomly pull assets . . . out of our operation, material assets that would keep us from making our EBITDA."[84]  Hutchinson specifically recalled the discussions about the Earnout Payments from the call and stated that, from Kuntz's perspective, "one of the most important points was the increase in the aggregate fleet size.  And in particular, that was the adding an additional 60 trucks per measurement period."[85]  Hutchinson testified that he "raised the issue" that an operating covenant would be necessary to prevent Schneider from transferring material assets out of W&S after the transaction.[86]  Hutchinson recalled that they discussed the transfer of

---

[82] JX 86.

[83] JX 84.

[84] Tr. 130:8–15 (Kuntz).

[85] *Id.* at 270:1–15 (Hutchinson).

[86] *Id.* at 270:16–271:12 (Hutchinson).

assets "sort of in a general way," but that "we also did discuss the trucks, specifically," because the additional trucks were "one of the key components for the ability to meet the earn-out target" considering the revenue was "based on having an increase in the overall fleet size."[87] Hutchinson testified that there was "agreement . . . on a bunch of the major points, including . . . the increase in fleet size, and that there would be operational covenants as part of the transaction."[88]

Schneider's witnesses contradicted Kuntz and Hutchinson's testimony about the May 11, 2016 call. David Whelpley, counsel for Schneider, did not recall that Kuntz "said that the only way to make the earn-out was via trucks."[89] In addition to testimony from Whelpley, Schneider cites testimony from Schiller, who did not recollect "any call involving [Schneider's counsel] or Schneider representatives . . . requiring Schneider to provide a net increase of 60 tractors each year for three years as a term of the stock purchase agreement."[90]

### 6. The Parties Finalize the Terms of the SPA.

On May 13, 2016, Schneider provided a revised draft of the SPA to the Sellers.[91] In that draft, Schneider replaced language indicating that it would "operate

---

[87] *Id.* at 271:22–272:7 (Hutchinson).

[88] *Id.* at 271:4–12 (Hutchinson).

[89] *Id.* at 1092:4–7 (Whelpley).

[90] *Id.* at 885:17–24 (Schiller).

[91] JX 88.

the Acquired Companies in the manner provided for on Exhibit A," with language providing that it would "have the right to operate their business as they see fit and will have no obligation (fiduciary or otherwise) to act in any manner in an attempt to protect or maximize any [Earnout Payments]."[92]  Schneider included new proposed language in Exhibit A, which contains principles and assumptions for calculating EBITDA based on the parties' financial projections.  The assumptions were:  "[c]apital expenditure equivalent to 60 class 8 tractors" and "[a]ssets includ[ing] 760 tractors for the first Measurement Period, 820 tractors for the second Measurement Period, and 880 tractors for the third Measurement Period."[93]  Whelpley testified that Exhibit A was intended solely as an accounting assumption and was not an operating covenant.[94]

On May 17, 2016, Sellers responded with a list of remaining material issues, noting that the "Post-Closing earn-out covenants remain limited and Buyer favorable."[95]  Schneider responded with a comment on the material issues list that Schneider would be "willing to agree that any of the following actions will accelerate the unpaid earn-out:  (1) failure by the Acquired Companies to acquire sixty (60) tractors during each Measurement Period and (2) any transfer, sale or disposition

---

[92] *Id.* at 88.00027.

[93] *Id.* at 88.00087.

[94] Tr. 1093:11–1094:15 (Whelpley).

[95] JX 91.00004.

during any Measurement Period of a material portion of the Acquired Companies' assets (determined on a consolidated basis)."[96]

On May 20, 2016, Schneider circulated a revised draft of the SPA incorporating the latest exchange of comments between the parties.[97] Schneider deleted the assumption that, for measuring EBITDA, there would be "[c]apital expenditure equivalent to 60 class 8 tractors" and that assets would "include 760 tractors for the first Measurement Period, 820 tractors for the second Measurement Period and 880 tractors for the third Measurement Period."[98] At the same time, Schneider added two operating covenants, which were located in Exhibit D to that draft.[99] The first covenant required Schneider to "cause one or more of the Acquired Companies to acquire, in the aggregate, sixty (60) class 8 tractors" during each Measurement Period.[100] The second covenant required Schneider to "cause the Acquired Companies to not sell, dispose of, or otherwise transfer to any other Person a material portion of the assets of the Acquired Companies" without consent by the Sellers.[101] Hutchinson understood that the change from the accounting assumption

---

[96] JX 92.00005.

[97] JX 94.00001.

[98] *Id.* at 94.00083.

[99] *Id.* at 94.00090.

[100] *Id.*

[101] *Id.*

to the operating covenant was a "simplification of the prior draft," and that he did not understand that Schneider was "unwilling to provide 60 tractors to increase the size of the fleet" as a result of the changes from the May 13 to the May 20 draft of the SPA.[102] Kuntz testified that, like Hutchinson, his understanding of the deal had not changed between the May 13 and May 20 draft.[103]

On May 25, 2016, Sellers proposed a revision to the operating covenants. Sellers sought to impose an obligation on Schneider to "cause one or more of the Acquired Companies to acquire, in the aggregate, not less than sixty (60) class 8 tractors (the "Tractors") and such greater number of Tractors and other equipment necessary to the accommodate the Acquired Companies' operations, including any growth related thereto."[104] Sellers also included eight separately numbered paragraphs containing additional operating covenants for the Acquired Companies, covering matters including employee compensation, reassignment of personnel, cutting staff, and closing a key terminal.[105] Schneider struck the language in the next turn of the SPA that would have required Schneider to acquire "such greater number of Tractors and other equipment necessary to accommodate the Acquired Companies' operations, including any growth related thereto," as well as seven of

---

[102] Tr. 285:15–286:1, 292:3–7 (Hutchinson).

[103] *Id.* at 140:9–141:7 (Kuntz).

[104] JX 98.00009.

[105] *Id.* at 98.00009–10.

the eight newly proposed operating covenants. Those proposed covenants were not included in the final version of the SPA.[106]

At this time, Schneider continued to create projections for W&S which assumed the purchase of 60 growth tractors annually after the W&S acquisition. Schneider's "3YP Capital Expenditure Summary" dated May 25, 2016 indicated that Schneider intended to purchase 60 growth tractors in 2017, 2018, and 2019, in addition to purchasing replacement tractors for those years.[107] Schneider's internal valuation model dated May 26, 2016 also assumed that Schneider would add 60 tractors annually, for a total of 820 tractors in 2016, 880 tractors in 2017, and 940 tractors in 2018.[108]

The parties executed the SPA on June 1, 2016, and closed the transaction that same day.[109] According to Rourke, Schneider executive Bob Elkins was responsible for ensuring that Schneider complied with the SPA after the acquisition.[110] Elkins admitted that he had never reviewed any drafts of the SPA prior to the acquisition, that he never saw the final SPA while he was the head of the division that included W&S, and that he had never seen a copy of Exhibit E to the SPA, which contained

---

[106] JX 103.00079–80.

[107] JX 100.0004.

[108] JX 102.00035, .00040.

[109] PTO, III ¶ 3.

[110] Tr. 661:13–662:19 (Rourke).

25

all of the Operating Covenants for the post-closing operation of W&S.[111] Elkins testified that he had never been briefed regarding the terms of the SPA, and that he was not aware of the Tractor Acquisition Covenant, the Material Asset Covenant, or the Business Continuity Covenant.[112] He agreed that it would have been helpful to know about the obligations created by the covenants as the head of W&S after the acquisition.[113]

On June 10, 2016, after the SPA closed, Aaron Cousineau, the controller for the division of Schneider that included W&S, sent Elkins a draft of a "Capital/Release/Expenditure Request" (a "CLER") for 26 tractors.[114] Cousineau wrote that the CLER included "verbiage calling out this will be 26 of the 60 growth tractors."[115] The CLER stated that the request was for "New Business Tractors for W&S Growth (26 tractors)," that "Tractors will be used to fund 26 of total 60 tractors per agreement," and that "Funds will be reconciled against W&S growth capital for first 12 months per agreement (26 of 60 growth tractors)."[116] The CLER further stated that the funds for the tractors had been "committed to dealers prior to close."[117]

---

[111] *Id.* at 973:19–974:10 (Elkins).

[112] *Id.* at 974:11–975:13 (Elkins).

[113] *Id.* at 975:14–24 (Elkins).

[114] JX 118.

[115] *Id.* at 118.00001.

[116] *Id.* at 118.00004.

[117] *Id.* at 118.00005.

On direct examination, Cousineau testified that he did not participate in negotiations regarding the SPA, did not review drafts of the SPA, and did not "see[] or gain[] visibility to that document until assisting in some of the earn-out documents."[118] On cross-examination, Cousineau testified that the language in the CLER regarding purchasing tractors "pursuant to the agreement" was based on his understanding that the SPA required purchasing 60 growth tractors.[119]

After the acquisition, like Cousineau, Schneider executive Michael Gasick acted as if the SPA contractually required Schneider to purchase 60 growth tractors in each of the next three years. On January 30, 2017, Gasick emailed Elkins stating:

> We need to prepare you to have a conversation with Ray [Kuntz] about the contractual 60 class 8 tractors that were part of the SPA. We will likely need a waiver from him that he agrees he does not need the 60 tractors. . . . The SPA is clear that we need to provide the 60 class 8 tractors in each of the three years of the earn out. We all know he does not need them, so he needs to waive this requirement for the first 12 month period. The waiver needs to happen no later than June.[120]

---

[118] Tr. 1044:1–1045:5 (Cousineau). The record reflects that Cousineau did receive at least one email from Schneider's counsel regarding the "Earn-Out Principles," though the substance of that email is redacted on the grounds of attorney-client privilege. JX 288. Although Cousineau received this email, he testified on cross-examination that he did not "communicate with counsel regarding the stock purchase agreement" during the SPA negotiations. Tr. 1073:1–6 (Cousineau).

[119] Tr. 1074:17–1076:19 (Cousineau).

[120] JX 164.

At this time, Schneider had already purchased 71 replacement tractors.[121] At trial, Gasick "did not know exactly" if he was aware of how many tractors Schneider had purchased at the time of this email, but he testified that he communicated "regularly" regarding "tracking . . . 60 tractors."[122] Kuntz did not waive the Tractor Acquisition Covenant.

## C. Schneider's Operation of W&S Post-Closing

The parties agree that, for each Measurement Period, W&S acquired more than 60 tractors—but not 60 growth tractors—and that Schneider informed the Sellers that W&S's EBITDA fell short of the EBITDA Targets. During the first Measurement Period, Schneider caused W&S to acquire 71 class 8 tractors and eliminated or sold 108 class 8 tractors.[123] On July 21, 2017, Schneider provided the Sellers' Representative with an Annual Contingent Payment Statement ("ACPS") which represented that the Acquired Companies' EBITDA for the first Measurement Period was $18.7 million, as compared to the EBITDA Target of $36 million.[124] During the second Measurement Period, Schneider caused W&S to acquire 102 class 8 tractors and eliminated or sold 104 class 8 tractors.[125] On July 27, 2018, Schneider

---

[121] JX 255.

[122] Tr. 781:4–17, 777:22–778:4 (Gasick).

[123] PTO, III ¶ 12.

[124] *Id.* ¶ 13.

[125] *Id.* ¶ 12.

provided the Sellers' Representative with an ACPS representing that the Acquired Companies' EBITDA for the second Measurement Period was $837,000, as compared to the EBITDA Target of $46 million.[126] During the third Measurement Period, Schneider caused W&S to acquire 137 class 8 tractors and eliminated or sold 199 class 8 tractors.[127] On July 25, 2019, Schneider provided the Sellers' Representative with an ACPS which represented that the Acquired Companies' EBITDA for the third Measurement Period was negative $26.3 million, as compared to the EBITDA Target of $59 million.[128] Schneider thus did not make any of the Earnout Payments to the Sellers.[129]

The parties' explanations differ as to the cause of W&S's failure to hit the EBITDA Targets. Sellers argue that Schneider shrank the size of W&S's fleet every Measurement Period, leased 70 W&S tractors to another of Schneider's divisions in February 2017 (the "Tractor Lease"),[130] and reallocated approximately half of W&S's space at what was its largest terminal in Fontana, California (the "Fontana Terminal").[131] Sellers also contend that Schneider stopped recruiting drivers for

---

[126] *Id.* ¶ 14.

[127] *Id.* ¶ 12.

[128] *Id.* ¶ 15.

[129] *Id.* ¶ 16.

[130] JX 175; Tr. 995:12–23 (Elkins).

[131] Tr. 457:1–21 (Schenk).

W&S.[132] Sellers point out that, in June 2017, Schneider issued an order "to minimize the new accounts we were going after" to "slow[] the pipeline of when business starts to be implemented" because W&S had fallen behind in servicing its existing business.[133]

Schneider attributes W&S's failure to hit the EBITDA Targets to other factors. Schneider argues that Sellers' projections were too aggressive,[134] customers failed to materialize as committed,[135] and existing customer relationships were marginal.[136] In its post-trial briefing, Schneider explained that integrating W&S, a trucking company, and Lodeso, a company that provided final mile distribution services, proved to be challenging.[137] Schneider also pointed to a driver shortage across the trucking industry.[138]

Schneider's attempt to create a consolidated first-to-final-mile trucking network through acquiring W&S ultimately ended in failure, costing Schneider

---

[132] JX 203; Tr. 172:16–174:19, 182:3–184:11 (Kuntz); *id.* at 437:22–440:24, 462:19–463:4 (Schenk); *id.* at 945:22–949:11 (Elkins).

[133] JX 202.00001; Tr. 180:22–183:5, 186:11–187:10 (Kuntz); *id.* at 386:1–6 (Darlington).

[134] Tr. 924:11–925:19 (Elkins).

[135] JX 124.

[136] JX 203.0001.

[137] Plaintiff/Counterclaim Defendant's Opening Post-Trial Brief ("Pl.'s Op. Br.") 27–28.

[138] *Id.* at 28–29.

nearly $180 million.[139]  On July 29, 2019, Schneider's board of directors approved a structured shutdown of its first-to-final mile services.[140]

### D.    Procedural History

On October 4, 2017, Schneider initiated this litigation in the Court of Chancery, seeking a declaratory judgment that it was not obligated to pay the Earnout Payments and that it had complied with the Tractor Acquisition Covenant (Compl. Count I).[141]    The Sellers counterclaimed, contending that Schneider breached the SPA (Countercl. Count I) or breached the implied covenant of good faith and fair dealing inherent in the SPA (Countercl. Count II).[142]

In 2018, the parties filed cross-motions for judgment on the pleadings.  In their motions, the parties disputed whether Schneider breached the Tractor Acquisition and Business Continuity Covenants.[143]  The parties also disputed whether Schneider operated W&S so as to prevent it from achieving the EBITDA Targets in violation of the implied covenant of good faith and fair dealing.[144]    Justice, then-Vice Chancellor, Montgomery-Reeves denied the cross-motions for judgment on the

---

[139] Tr. 660:10–661:1 (Rourke).

[140] JX 229.00003.

[141] Ct. Ch. Dkt. 1 ¶¶ 14–15.

[142] Ct. Ch. Dkt. 3 ¶¶ 56–71.

[143] Ct. Ch. Dkt. 74 at 2–3.

[144] *Id.* at 3.

pleadings and held that the parties had "advance[d] reasonable but conflicting interpretations of the contractual provisions at issue in the pending cross-motions."[145] The court concluded that both interpretations were "commercially reasonable," and that, "[t]o the extent some issues ultimately may be decided as a matter of law, a fuller development of the facts should serve to clarify the law or help the Court determine its application to this dispute."[146] The court further held that, "[b]ecause both parties assert reasonable interpretations of the express terms of the contract, the holes that the implied covenant may or may not fill cannot be determined at this stage."[147]

Following discovery, the parties filed cross-motions for summary judgment. In a July 16, 2020 opinion, the undersigned denied the motions, concluding that there were disputed issues of material fact that needed to be resolved through trial.[148] The court held a four-day trial in January 2021. There were 296 trial exhibits submitted into evidence, and ten witnesses testified.[149]

---

[145] *Id.* ¶ 5; *see also id.* ¶ 8 ("Schneider and Kuntz each offers a reasonable interpretation of the contract language.").

[146] Ct. Ch. Dkt. 74 ¶¶ 8, 14.

[147] *Id.* ¶ 13.

[148] *See* Ct. Ch. Dkt. 197.

[149] Trial was held remotely via Zoom technology.

After post-trial argument, the court questioned whether the Court of Chancery had subject matter jurisdiction over this case.[150] The parties had initially asserted that the Court of Chancery had subject matter jurisdiction under 8 *Del. C.* § 111.[151] That provision gives the Court of Chancery jurisdiction over civil actions "to interpret, apply, enforce or determine the validity of the provisions of . . . [a]ny instrument, document or agreement . . . to which a corporation and 1 or more holders of its stock are parties, and pursuant to which any such holder or holders sell or offer to sell any of such stock." 8 *Del. C.* § 111(a)(2). The court questioned its jurisdiction over this matter because neither of the corporations subject to the SPA are Delaware corporations. *See Darby Emerging Markets Fund, L.P. v. Ryan*, 2013 WL 6401131, at *7 (Del. Ch. Nov. 27, 2013) ("To the extent Section 111 is ambiguous with respect to its application to foreign entities, the synopsis appears to resolve that ambiguity by limiting Section 111's application to Delaware corporations.").[152]

---

[150] The issue of subject matter jurisdiction can be raised at any time, including by the court. *See* Ct. Ch. R. 12(h)(3); *IBM Corp. v. Comdisco, Inc.*, 602 A.2d 74, 77 n.5 (Del. Ch. 1991) ("[U]nlike many jurisdictions, judges in the Delaware Court of Chancery are obligated to decide whether a matter comes within the equitable jurisdiction of this Court regardless of whether the issue has been raised by the parties.").

[151] Compl. ¶ 10; Countercl. at 6.

[152] The court in *Darby* was referring to the synopsis of a 2003 amendment to § 111. *See* 2003 Delaware Laws Ch. 84 (S.B. 127) ("This amendment expands the jurisdiction of the Court of Chancery with respect to a variety of matters pertaining to *Delaware corporations*." (emphasis added)); *see also* 1 ROBERT S. SAUNDERS ET AL., FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 111.01 (7th ed. 2021) ("The application of section 111 is limited to Delaware corporations.").

The parties maintained that the Court of Chancery had jurisdiction over this action, but "to avoid any doubt," they moved to transfer this case to the Superior Court under 10 *Del. C.* § 1902.[153]  The motion was granted on September 3, 2021.[154]  On September 1, 2021, while that motion was pending, the Chief Justice of the Delaware Supreme Court designated the undersigned "to sit as a Judge on the Superior Court for the purpose of hearing and deciding all issues" in this case pursuant to Del. Const. art. IV, § 13(2), upon the case's transfer.[155]  Schneider filed its complaint in the Superior Court on October 20, 2021.[156]

In January and February 2022, the parties filed supplemental letters on the issue of fee shifting, citing the recent decision in *LPPAS Representative, LLC v. ATH Holding Co., LLC*, 2022 WL 94610 (Del. Ch. Jan. 10, 2022).[157]  The court considered this case submitted for decision on the date of Kuntz's final letter on February 16, 2022.[158]

---

[153] Ct. Ch. Dkt. 263.

[154] Ct. Ch. Dkt. 267.

[155] Super. Ct. Dkt. 2, Ex. C.

[156] *See* Super. Ct. Dkt. 1.

[157] Super. Ct. Dkt. 4–6.

[158] *See infra* note 308.

## II. ANALYSIS

This opinion first addresses whether Schneider breached any of the four Operating Covenants in the SPA. After that, the opinion considers whether Schneider breached the implied covenant of good faith and fair dealing. Lastly, the opinion addresses Kuntz's claim for attorneys' fees under the indemnification provision in the SPA.

### A. The Breach of Contract Claim

"Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003). A party asserting a breach of contract claim bears the burden of proving a breach by a preponderance of the evidence. *Base Optics Inc. v. Liu*, 2015 WL 3491495, at *13 (Del. Ch. May 29, 2015). "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *Del. Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002).

Delaware adheres to the objective theory of contracts. The objective theory of contracts requires the court to construe a contract as it would be "'understood by an objective, reasonable third party.'" *Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del.

2010) (quoting *NBC Universal v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)); *accord Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014). If a contract's language is clear and unambiguous, the court will give effect to the plain meaning of the contract's terms and provisions. *Osborn*, 991 A.2d at 1159–60. A contract is ambiguous if the court is able to "reasonably ascribe multiple and different interpretations to a contract." *Id.* at 1160. The "determination of ambiguity lies within the sole province of the court." *Id.* "The primary consideration in the construction of contract language is to fulfill, to the extent possible, the reasonable expectations of the parties at the time they contracted." *Bell Atl. Meridian Sys. v. Octel Commc'ns Corp.*, 1995 WL 707916, at *5 (Del. Ch. Nov. 28, 1995).

### 1. The Tractor Acquisition Covenant

The Tractor Acquisition Covenant required Schneider to "cause one or more of the Acquired Companies to acquire, in the aggregate, not less than sixty (60) class 8 tractors" each Measurement Period.[159] The Court of Chancery previously determined that both parties' competing interpretations were reasonable when denying the parties' cross-motions for judgment on the pleadings[160] and, later, cross-

---

[159] SPA, Ex. E.

[160] Ct. Ch. Dkt. 74 ¶ 8 ("Schneider and Kuntz each offers a reasonable interpretation of the contract language.").

motions for summary judgment.[161] Schneider maintains, as it has throughout this litigation, that the plain meaning of the Tractor Acquisition Covenant mandates judgment in its favor.[162] Schneider argues that the contract only requires it to purchase 60 tractors during each Measurement Period. Kuntz argues that the SPA requires Schneider to grow the fleet by 60 tractors during each Measurement Period.

The court's prior determinations that the Tractor Acquisition Covenant is susceptible to multiple reasonable interpretations—and is therefore ambiguous—is the law of the case.[163] The law of the case doctrine usually "requires that matters previously ruled upon by the same court be put to rest." *Frank G.W. v. Carol M.W.*, 457 A.2d 715, 718 (Del. 1983). The rule is not absolute. Until a final judgment is entered, interlocutory rulings "remain[] within the control of the court." *Id.* (quoting 46 AM. JUR. 2D *Judgments* § 700 at 851 (1969)). Nevertheless, adherence to the law of the case is particularly important when, as here, a successor judge inherits a case. In those circumstances, the general rule of the law of the case should be maintained except in "extraordinary circumstances." *Id.*; *accord Miller v. Wolstenholme*, 540

---

[161] Ct. Ch. Dkt. 197 at 28 ("Both parties have offered contested evidence as to the proper interpretation of the Tractor Acquisition Covenant. . . . Thus, summary judgment cannot be granted.").

[162] Pl.'s Op. Br. 33–34.

[163] *Taylor v. Jones*, 2006 WL 1510437, at *5 (Del. Ch. May 25, 2006) ("'[O]nce a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears.'") (quoting *May v. Bigmar, Inc.*, 838 A.2d 285, 288 n.8 (Del. Ch. 2003)).

A.2d 1088 (Del. 1988) (TABLE). To be sure, the Delaware Supreme Court "take[s] a dim view of a successor judge in a single case overruling a decision of his predecessor." *Frank G.W.*, 457 A.2d at 718.

Schneider has not established extraordinary circumstances warranting departure from the determination of Justice, then-Vice Chancellor, Montgomery-Reeves that the Tractor Acquisition Covenant is ambiguous. Then, as now, Schneider's and Kuntz's conflicting positions are each reasonable interpretations, and a "reasonable third person reading the [Tractor Acquisition Covenant] would be uncertain" as to whether the Tractor Acquisition Covenant required the purchase of 60 tractors in total or 60 growth tractors during each Measurement Period. *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997); *see* Ct. Ch. Dkt. 74 ¶¶ 3–8 (discussing the reasonableness of the parties' respective positions regarding the Tractor Acquisition Covenant). Accordingly, the court's prior ruling is the law of the case. The court did not depart from that ruling in denying cross-motions for summary judgment and does not do so here.

Because the Tractor Acquisition Covenant is ambiguous, the court must consider extrinsic evidence to determine its meaning. "When contractual language is reasonably susceptible to more than one meaning, all objective extrinsic evidence is considered: the overt statements and acts of the parties, the business context, prior dealings between the parties, and the business customs and usage in the industry."

38

*Bell Atl. Meridian Sys.*, 1995 WL 707916, at *6. A "party seeking judicial enforcement of their interpretation of the ambiguous language" may prevail by "show[ing] by a preponderance of the evidence that the other party knew or had reason to know of the meaning they attached to the language." *Id.* (citing Restatement (Second) of Contracts § 201 (1981) and *Corbin on Contracts* § 543 (1960)); *see also Kabakoff v. Zeneca, Inc.*, 2020 WL 6781240, at *20 (Del. Ch. Nov. 18, 2020) (observing that the court must "discern the intended meaning" of the contract "from the preponderance of the extrinsic evidence" (internal citations omitted)).

Kuntz has established by a preponderance of the evidence that Schneider knew that the Tractor Acquisition Covenant required it to purchase 60 growth tractors every Measurement Period. The documentary evidence establishes that the deal between Schneider and the Sellers required Schneider to purchase 60 growth tractors every Measurement Period. From the outset of their negotiations, the parties assumed that W&S would acquire 60 growth tractors annually. Cascadia marketed W&S based on the assumption that it would acquire 60 growth tractors in 2017 and 2018, as shown in the SFP.[164] The projections W&S and Cascadia provided to Schneider assumed that W&S would acquire 60 growth tractors in 2016, 2017, and

---

[164] *See* JX 239.

2018.[165] In analyzing the deal, Schneider incorporated those same assumptions into its internal projections[166] and its board presentations.[167]

The assumption that W&S would acquire 60 growth tractors annually formed part of the parties' understanding of the business deal. All of the letters of intent that the parties exchanged assumed Schneider would purchase "a minimum of 60 tractors and sufficient trailers for each 12 month EBITDA Measurement Period."[168] There is no dispute that when the parties executed the final, nonbinding letter of intent the parties understood the deal to require Schneider to purchase 60 growth tractors per year after the acquisition. Rourke understood the reference to 60 tractors in the final letter of intent to refer to "60 additional growth capex tractors."[169]

The SPA's drafting history also supports Kuntz's interpretation of the Tractor Acquisition Covenant. The Sellers' first draft requested that Schneider add a covenant obligating it to provide "appropriate equipment purchase support,"[170] which Sellers' negotiator said was a specific reference to the 60 growth tractors per

---

[165] JX 239 at Tab 2016 Budget p.3., Tab 2017 Projection p.3, Tab 2018 Projection p.3 (showing a 60 tractor per year increase: 630 tractors at the beginning of 2016, 690 at the beginning of 2017, 750 at the beginning of 2018, and 810 at the end of 2018).

[166] JX 102.00040.

[167] JX 27.00002–3; JX 64.00018, .00026.

[168] JX 43.00005, 45.00006, 47.00005.

[169] Tr. 679:10–18 (Rourke).

[170] JX 65.00026; *see* Tr. 264:22–265:9 (Hutchinson).

Measurement Period referenced in the letter of intent. The May 13 draft that Schneider circulated specifically contemplated that the Acquired Companies' fleet would grow by 60 tractors per Measurement Period through the use of an example.[171] Schneider then replaced this example on May 20 with the language: "to acquire, in the aggregate, sixty (60) class 8 tractors."[172]

The documentary record and witness testimony show that the principal negotiators on both sides struck a deal with the understanding that Schneider would be required to purchase 60 growth tractors during each Measurement Period. In the final drafting of the SPA, the lawyers for Schneider sought to water down all of the operational covenants so as to provide Schneider with maximum autonomy in operating the business, post-close. But the evidence clearly and conclusively shows that Schneider and its counsel never expressed any view, either internally or to Sellers, that the 60 growth tractor term, upon which the parties had previously agreed, was subject to further negotiation or that Schneider changed its mind on that term at the end of the process of documenting the deal.[173]

Schneider's conduct in performing its obligations under the SPA underscores this conclusion. As this court has observed, "in giving effect to the parties'

---

[171] *See* JX 88.00087.

[172] JX 94.00090.

[173] Tr. 292:3–7 (Hutchinson).

intentions, it is generally accepted that the parties' conduct in the performance of the contract before any controversy has arisen should be given great weight." *S'holder Rep. Servs. LLC v. Gilead Scis., Inc.*, 2017 WL 1015621, at \*16 (Del. Ch. Mar. 15, 2017), *aff'd*, 177 A.3d 610 (Del. 2017) (internal quotations and citations omitted). Aaron Cousineau, the controller for the division of Schneider that included W&S, testified that the draft of the CLER he sent to Schneider executive Bob Elkins reflected his understanding that Schneider was required to purchase 60 growth tractors as was required under the SPA.[174] In addition, Gasick was prepared to have Elkins ask Kuntz for a waiver so that Schneider could avoid purchasing all 60 growth tractors as was required under the Tractor Acquisition Covenant.[175]

The business realities of the deal also reinforce Kuntz's position. Kuntz pursued the deal with Schneider to grow W&S.[176] The SPA and the history surrounding its formation evince an agreement that was designed to foster W&S's growth as well.[177] Meanwhile, there is scant extrinsic evidence in support of Schneider's position that it was only required to purchase 60 gross tractors per Measurement Period.

---

[174] Tr. 1074:17–1076:19 (Cousineau); *see* JX 118.

[175] *See* JX 164.

[176] Tr. 63:17–22 (Kuntz).

[177] *See, e.g.*, JX 239, 27.00002–3, 45.00005, 88.00087.

Schneider argues that, despite all of the foregoing evidence, the Sellers ultimately "failed to secure" their prior deal to acquire 60 growth tractors every Measurement Period. Schneider points to Sellers' proposed revisions in a May 25, 2016 draft of the SPA, and Sellers' rejection of that language as evidence that Schneider considered and rejected the concept of growth tractors.[178] The following paragraph reflects the Sellers' proposed additional language to the Tractor Acquisition Covenant in bold, and Schneider's rejection in strikethrough text. It states that, during each Measurement Period, the Buyer shall:

> cause one or more of the Acquired Companies to acquire, in the aggregate, **not less than** sixty (60) class 8 tractors ~~(the "*Tractors*") and such greater number of Tractors and other equipment necessary to accommodate the Acquired Companies' operations, including any growth related thereto;~~[179]

Schneider argues that its rejection of Sellers' language, including the term "growth," demonstrates that Schneider "expressly reject[ed] Sellers' attempt to tie Schneider's obligation to provide tractors to the growth of the Acquired Companies."[180] When considered in the overall context of negotiations, including the Sellers' May 25, 2016 turn of the SPA containing additions to the operational covenants, however, Schneider's argument is unpersuasive.

---

[178] Pl.'s Op. Br. 35–37.

[179] *Compare* JX 98.00009, *with* JX 103.00079.

[180] Pl.'s Op. Br. 36.

Sellers' May 25, 2016 revisions included numerous additional operational covenants that could rightfully be interpreted as severely encroaching upon Schneider's ability to operate the Acquired Companies post-close, tying all of them one way or another to achieving the EBITDA Targets.[181] Schneider's May 27, 2016 draft struck nearly all of them.[182] But Schneider did not materially alter the original language requiring Schneider to purchase 60 tractors in the aggregate. Sellers' lead negotiator, Hutchinson, credibly testified that prior to receiving Schneider's revisions and at no time thereafter was he every told that Schneider was unwilling to provide 60 growth tractors.[183] Indeed, Schneider points to no evidence that it communicated to Sellers that the deal struck with Kuntz over adding 60 tractors to the overall fleet during each Measurement Period was no longer operative. Nor does Schneider point to any internal communications to support this argument.

Schneider's argument is also unconvincing in light of the Forthright Negotiator Principle. The court may employ this principle when it is engaged in the interpretation of an ambiguous contract and "a review of the extrinsic evidence does not lead the court to an 'obvious' conclusion" regarding the "'shared intent' of the

---

[181] JX 99.00007–08. For example, Sellers proposed covenants pertaining to compensation and benefits of employees, reassignment of personnel, cutting staff and expenses, and altering the ability to obtain financing at the Acquired Companies.

[182] JX 103.00079–80.

[183] Tr. 292:3–7 (Hutchinson).

parties." *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003). Under the Forthright Negotiator Principle,

> [o]nly an objectively reasonable interpretation that is in fact held by one side of a negotiation and which the other side *knew or had reason to know that the first party held* can be enforced as a contractual duty. This principle is capable of resolving disputes arising from ambiguous contract language because it is logically impossible for a contracting party, operating in good faith, *both* to have a subjective interpretation of ambiguous language different from that of her counterparty and to know of her counterparty's differing interpretation.

*Id.* (quoting *U.S. W., Inc. v. Time Warner Inc.*, 1996 WL 307445, at *10 (Del. Ch. June 6, 1996)) (emphasis in original). As of the May 13 draft, the parties mutually understood that Schneider was to ensure that W&S's fleet would grow by 60 net tractors in each Measurement Period, given that there was an example in that draft describing assets to include 760 tractors in the first Measurement Period, 820 tractors in the second Measurement Period, and 880 tractors in the third Measurement Period.[184] In the May 20 draft, Schneider replaced the text "Capital expenditure equivalent to 60 class 8 tractors" and the accompanying example with the sentence: "The Buyer shall cause one or more of the Acquired Companies to acquire, in the aggregate, sixty (60) class 8 tractors."[185] There is no indication that Schneider's edits were meant to alter the meaning of the Tractor Acquisition Covenant in the

---

[184] JX 88.00087.

[185] *Compare id.*, *with* JX 94.00090.

May 13 draft. Hutchinson and Kuntz testified that Sellers understood the May 20 draft to reflect the "same understanding" between the parties in the prior draft and that the May 20 draft was merely a "simplification" of this understanding.[186] Both sides agree that no one from Schneider informed Sellers that the meaning in the May 20 draft, or any draft circulated thereafter, was meant to differ from the draft that had been disseminated on May 13.[187] Indeed, there is no persuasive evidence that at

---

[186] Tr. 140:9–18 (Kuntz); *id.* at 285:23 (Hutchinson).

[187] *Id.* 140:19–141:7 (Kuntz):

> Q. Did anyone tell you, between—at any time, did anyone tell you at any time before you signed this agreement that the 60 Class 8 tractors were not the tractors that had been discussed you needed to make the EBITDA targets, the additional growth?
>
> A. No one ever did.
>
> Q. Did anyone ever tell you, prior to you signing this from [W&S]—from Schneider or McGuireWoods, that they could use or—they could replace a tractor and that would count as one of the 60 tractors?
>
> A. No one ever said that.

Tr. 292:3–7 (Hutchinson) ("Q. Did anyone ever tell you, up until this point or at any time, that by striking this language, Schneider was unwilling to provide 60 tractors to increase the size of the fleet? A. No. Never."); *id.* at 694:5–13 (Rourke):

> Q. . . . Isn't it true that at no point up until the execution of the SPA did you or anyone on the Schneider team tell anyone at Watkins & Shepard or their representatives that the 60 tractors referred to in the LOI were actually replacement tractors?
>
> A. I don't have any knowledge of that, no.

Tr. 1106:18–22 (Whelpley) ("Q. Did you ever tell [W&S'] lawyers that the provision concerning 60 tractors didn't mean growing the fleet by 60 tractors? A. No, I did not have that discussion with them."); *id.* at 1124:16–24 (Whelpley):

> Q. Well, let me straightly ask you this: Did you have any conversations between—after sending over the May 13th draft with Watkins & Shepard or

the time of the May 20 draft, Schneider's own representatives had adopted Schneider's current interpretation of the Tractor Acquisition Covenant. Schneider had reason to know that Sellers maintained their understanding of the Tractor Acquisition Covenant from the May 13 draft. Due to the ambiguity of the subsequent drafts, it was Schneider's burden to indicate that its understanding of the covenant had changed, considering Sellers' silence on the matter. Schneider's failure to do so thus further supports Sellers' interpretation of the Tractor Acquisition Covenant.

In considering all of the evidence, the court is persuaded that the parties intended the Tractor Acquisition Covenant to require Schneider to grow the fleet by at least 60 tractors during each Measurement Period for the Acquired Companies. There is no dispute that Schneider did not do so in the First Measurement Period. Sellers have therefore established that Schneider breached the SPA.

## 2. The Material Asset Covenant

Under the Material Asset Covenant, Schneider could not "reorganize, consolidate or otherwise take steps to sell, dispose or otherwise transfer any material portion of the assets of the Acquired Companies to an entity other than an Acquired

---

their lawyers or Cascadia about the change from the May 13 language that we just looked at to the May 20 new Exhibit D? Did you have any conversations with anybody on the other side about the change in meaning?

A. I don't recall that, no.

Company" from the close of the transaction to the end of the final Measurement Period.[188] A key term of this covenant is the word "material." Although it is undefined in the SPA as a freestanding term, Kuntz contends that the SPA "has a low threshold for what qualifies as 'material.'"[189] To support that proposition, he points to the SPA's definition of a "Material Contract," which includes, in pertinent part:

> (b) each Contract pursuant to which any third party is indebted or owes money to an Acquired Company and the remaining unpaid balance of which is in excess of $50,000 and (c) each Contract providing for the purchase, maintenance or acquisition, or the sale or furnishing, of materials, supplies, merchandise, equipment or services . . . that would reasonably be expected to result in payments in excess of $50,000 within any 12-month period . . . .[190]

Schneider counters that Kuntz's reliance on one of the SPA's defined terms does not provide the court with a "generally applicable definition" of the word "material."[191] Schneider also focuses on other defined terms in the SPA using the word "material" that Kuntz ignores, such as "Material Customers" and "Material Suppliers."[192] Neither of these defined terms offers the support for Kuntz's

---

[188] SPA, Ex. E.

[189] Defendant and Counterclaim Plaintiff's Post-Trial Opening Brief ("Def.'s Op. Br.") 67.

[190] JX 108.00014.

[191] Plaintiff/Counterclaim Defendant's Post-Trial Answering Brief ("Pl.'s Ans. Br.") 52.

[192] *See* SPA § 4.19(a), (b).

definition of "material" that he draws from "Material Contract."[193]  The SPA's definition of "Material Contract" does not carry the interpretive heft that Kuntz seeks to ascribe to the Material Asset Covenant.  Indeed, at post-trial oral argument, Kuntz retreated from the position he took in his briefs, acknowledging that Schneider would not be in breach of the Material Asset Covenant if it transferred $50,000 worth of assets outside of W&S, arguing instead that the "level of materiality" is based on the "facts and circumstances of every case."[194]

For its part, Schneider argues that a material asset transfer must be considered within the specific context of the contract language.  The Material Asset Covenant states that Schneider shall not "reorganize, consolidate or otherwise take steps to sell, dispose or otherwise transfer any material portion of the [acquired] assets."  Schneider insists that the Material Asset Covenant "expressly ties the types of transfers it covers to changes that would fundamentally alter the structure of the Acquired Companies—such as through a reorganization or consolidation—not routine tractor management."[195]  Kuntz counters that Schneider's position ignores the negotiations surrounding the provision.  Kuntz notes that it was Sellers, not Schneider, who added the words "reorganize, consolidate, or otherwise" to the May

---

[193] Pl.'s Ans. Br. 52–53.

[194] Ct. Ch. Dkt. 251 at 129:4–16.

[195] Pl.'s Op. Br. 62–63.

25, 2016 draft of the SPA. Kuntz argues the Sellers added this language so as to increase, not reduce, the covenant's protection to the Sellers.[196]

The parties have devoted very little of their briefing to what the parties intended when drafting the Material Asset Covenant. Thus, because the parties have not defined a contractual term, the court may turn to a dictionary as a reliable source to determine what the parties intended. *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("[D]ictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract."); *accord Tetragon Fin. Grp. Ltd. v. Ripple Labs Inc.*, 2021 WL 1053835, at *4 (Del. Ch. Mar. 19, 2021); *see also Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at *10 (Del. Ch. July 6, 2018) ("in the case of an undefined term [in a contract], the interpreting court may consult the dictionary, if that is deemed useful, when determining the term's plain meaning"). Dictionary definitions of "material" include: "having real importance or great consequences";[197] "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant;

---

[196] Defendant and Counterclaim Plaintiff's Post-Trial Answering Brief ("Def.'s Ans. Br.") 46; JX 98.00009.

[197] *Material*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/material (last visited Feb. 7, 2022).

essential";[198] and "[b]eing both relevant and consequential; crucial."[199]  *See Metro Storage Int'l LLC v. Harron*, 2019 WL 3282613, at *8 n.5 (Del. Ch. July 19, 2019) (citing same dictionaries when defining "materially").[200]

Materiality is a context-specific determination.  *See SphereCommerce, LLC v. Caulfield*, 2022 WL 325952, at *7 n.64 (Del. Ch. Feb. 3, 2022) (observing that whether a contract breach is material "'is necessarily imprecise and flexible'" (quoting Restatement (Second) of Contracts § 241, cmt. a (1981))); *Constantini v. GJP Developers, Inc.*, 2015 WL 5122992, at *8 n.93 (Del. Ch. Aug. 24, 2015) ("Whether a breach [of contract] is material is a context-specific analysis . . . ."); *In re Massey Energy Co.*, 2011 WL 2176479, at *29 (Del. Ch. May 31, 2011) (analyzing whether derivative claims were "material in relation to the value of [the company] as an entity"); *Rosser v. New Valley Corp.*, 2005 WL 1364624, at *8 (Del. Ch. May 27, 2005) (noting that the valuation of the company's major assets would

---

[198] *Material*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[199] *Material*, THE AM. HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, https://ahdictionary.com/word/search.html?q=Material (last visited Feb. 7, 2022).

[200] In one sentence, Schneider argues that Kuntz failed to plead a breach of the Material Asset Covenant in his Counterclaim.  Pl.'s Op. Br. 58.  In the Joint Pre-Trial Stipulation, however, the parties jointly asked the court to rule on this issue.  PTO, IV ¶ 6.  Therefore, Schneider consented to trying this issue.  *See* Ct. Ch. R. 15(b) ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."); *Jackson's Ridge Homeowners Ass'n v. May*, 2007 WL 2214500, at *1 (Del. Ch. Aug. 1, 2007); *see also* 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1219 (4th ed.) ("[C]larification as to a legal theory may be achieved through the use of pretrial conferences and pretrial orders . . . .").

be material in one context, but not in another); *see also Bandera Master Fund LP v. Boardwalk Pipeline P'rs, LP*, 2021 WL 5267734, at *68 (Del. Ch. Nov. 12, 2021) (observing that determining the existence of a "material adverse effect" for contract purposes is "one of the most difficult issues under Delaware law").

Turning to the application of the Material Asset Covenant, Kuntz argues that Schneider violated the covenant in two ways. First, Kuntz contends that Schneider breached the covenant when it executed the Tractor Lease.[201] Second, Kuntz asserts that Schneider breached the Material Asset Covenant by reallocating approximately half of the space in W&S's Fontana terminal to Schneider's dedicated automotive parts delivery business.[202]

### a. The Tractor Lease

In February 2017, Schneider caused W&S to enter into the Tractor Lease.[203] Under the Tractor Lease's terms, W&S leased 70 of its tractors to Schneider from February 22, 2017 through the end of that calendar year.[204] The monthly lease payment was calculated in an attached schedule for each of the respective 70 tractors and fluctuated between $330.19 and $2,691.07 per month.[205] Each of the 70 tractors

---

[201] Def.'s Op. Br. 66; *see* JX 175.

[202] Def.'s Op. Br. 70.

[203] *See* JX 175.

[204] *Id.* ¶ 2.

[205] *Id.*, Schedule A.

was one of three different models and had a model year ranging from 2014 through 2017.[206]

Kuntz argues that the 70 tractors were material assets because they made up approximately 10% of W&S's assets,[207] 8.5% of W&S's tractor capacity,[208] and could generate significant revenue and EBITDA.[209] Kuntz also points to lost profits that he attributes to the Tractor Lease. Specifically, Kuntz asserts that just one month after the execution of the Tractor Lease, one of W&S's largest customers, Wayfair, increased its orders more than three-fold from approximately $45,000 to $150,000 per day.[210] Kuntz argues that the increased business from Wayfair required the use of more tractors, which were no longer available due to the Tractor Lease.[211] Thus, W&S was required to hire third-party carriers to accommodate the surge in demand, which Kuntz alleges was more costly than if W&S had, instead, used its own tractors. Additionally, Kuntz contends that W&S was unable to accommodate the increased demand through the use of third-party carriers alone, leading to delays and damage

---

[206] *Id.*

[207] Def.'s Op. Br. 68 (citing JX 9.00040, 110).

[208] Def.'s Ans. Br. 45 (citing JX 254).

[209] *See* Def.'s Op. Br. 68.

[210] *Id.* at 69; *see* JX 178.00007.

[211] Def.'s Op. Br. 69.

to W&S's reputation.[212]  Kuntz argues that Wayfair eventually pulled business from W&S once it realized that W&S could not handle its additional freight.[213]

Schneider counters that the 70 tractors subject to the Tractor Lease were not a material portion of W&S's assets.  According to Schneider, the 70 tractors represented less than 10% of W&S's assets.[214]

Schneider also disagrees with Kuntz's recounting of W&S's falling out with Wayfair.  Schneider asserts that between the time of executing the SPA and the signing of the Tractor Lease, W&S's monthly average of "open tractors" grew from approximately 20 to between 60 and 80.[215]  Those tractors were sitting idle without drivers and were thus generating costs, but no revenue.[216]  According to Schneider, W&S could not fill the tractors "due to a lack of freight volume, a rapid influx of new tractors due to purchase commitments W&S had made prior to the acquisition, and challenges in hiring and retaining a sufficient number of drivers."[217]  Schneider contends that the Tractor Lease made sense for both Schneider and W&S. Schneider's expert, Donald Orr, opined that "mov[ing] . . . open tractors to other

---

[212] *Id.*

[213] *Id.* at 69–70; *see* JX 188.

[214] *See* Pl.'s Op. Br. 62 (citing JX 1.00009).

[215] *Id.* at 59 (citing JX 147, DDX 7); *see also* JX 148.

[216] *See* Tr. 472:1–10 (Schenk); *id.* at 941:10–22 (Elkins); Clowdis June 5, 2020 Dep. 249:11–250:11.

[217] Pl.'s Op. Br. 59.

operations where tractors could be used" is a "common, practical solution, given that the industry has such a significant problem keeping drivers in tractors."[218] Moving tractors from one division to another division that can use them "is a practical approach for both divisions."[219]

Schneider argues that even if those 70 tractors had been available for the increased business from Wayfair, they would not have been operational when needed due to the time it would have taken to hire and train drivers.[220] The use of third-party carriers was therefore more practical because their drivers and tractors would be ready to work immediately upon being hired.[221] Schneider also contends that it was "common" for W&S to use third-party carriers when it did not have enough tractors to accommodate demand and that this is a practice accepted in the broader industry.[222] In addition, Schneider disputes that the 70 tractors would have been suitable for the consumer deliveries that Wayfair required.[223]

---

[218] JX 232.00023.

[219] *Id.* According to Richard Schenk, the former director of truckload operations at W&S, if W&S needed to contract for Schneider trucks or outside carriers to haul freight, W&S would receive revenue credit for the freight hauled by those carriers. Tr. 490:11–23 (Schenk).

[220] Pl.'s Ans. Br. 56–57.

[221] *See id.*

[222] Pl.'s Op. Br. at 61–62.

[223] Pl.'s Ans. Br. 57.

The parties presented industry expert opinions on this issue, but not valuation expert opinion.[224] Having considered the evidence as presented, the court concludes that Kuntz has not carried his burden. First, Kuntz has failed to prove that the 70 tractors made up approximately 10% of W&S's assets at the time of the Tractor Lease. Kuntz uses a Tangible Personal Property spreadsheet dated June 1, 2016 to determine the value of the 70 tractors, but calculates the value of W&S's total assets based on a fiscal year 2014 audit.[225] A subsequent audit values W&S's total assets in 2014 about 8% higher than the number Kuntz uses, which would further decrease the asset share of the 70 tractors.[226] Between 2014 and 2015, W&S's total assets increased by over 13%.[227] Between 2013 and 2014, total assets increased by over 40%, and by over 14% within the prior one-year period.[228] The parties have not presented direct evidence of the value of W&S's total assets in 2016. The changes in W&S's total asset values from 2012 through 2015 show that the value of W&S

---

[224] Both parties submitted expert opinion testimony from trucking industry experts. Schneider's expert, Donald Orr, worked in the trucking industry from the early 1970s until retiring in 2019. JX 232.00004–05. Kuntz's expert, Charles Clowdis, Jr., is the Managing Director of Trans-Logistics Group, Inc., a transportation and logistics firm created in 2018. JX 244.00003. Clowdis has nearly five decades of experience in the field of motor-carrier transportation, fleet operations, and supply chain management. *Id.* Both experts were deposed and submitted reports, but neither testified live at trial.

[225] *See* JX 9.00040, 110.

[226] *Compare* JX 9.00040 ($88,771,000 based on 2015 audit), *with* JX 242.00006 ($95,864,234 based on 2016 audit).

[227] *See* JX 242.00006.

[228] *See* JX 9.00040, 242.00006.

total assets could change significantly in any given year. Furthermore, the data available to the court show that the value of W&S's total assets was trending upward. Even assuming that the 70 transferred tractors were worth approximately $8.4 million as Kuntz asserts—which, as discussed below, the court does not accept— these amount to just over 9% of W&S's total assets at the end of 2015.

Kuntz's per-tractor EBITDA calculation is similarly suspect. Kuntz asserts that each of the 70 tractors could generate an average of $83,333 of EBITDA per year.[229] But he makes this calculation based on a 2016 presentation that values the EBITDA generated by 60 *new* tractors at $5 million (or $83,333 per tractor) per year.[230] Only two of the 70 leased tractors had a 2017 model year, the year the Tractor Lease was signed.[231] And the per-tractor monthly rent amount ranged from $330.19 to $2,691.07.[232] It is thus apparent that these 70 tractors differed significantly from the 60 new tractors that were considered in the 2016 presentation. The court cannot, therefore, ascribe comparable EBITDA generating value to them on this record.

The Tractor Lease did not cause W&S's business relationship with Wayfair to fail. Schneider worked in good faith to recruit more drivers for W&S, and

[229] Def.'s Ans. Br. 46.

[230] JX 286.00199.

[231] *See* JX 175.

[232] *See id.*

Schneider was under no obligation to transfer drivers from its other affiliates to W&S when its recruiting efforts failed.[233] Indeed, Schneider also counters that: (1) even if Schneider had not executed the Tractor Lease, those 70 tractors would not have been operational by the time Wayfair's increased freight began to arrive,[234] and (2) the 70 tractors implicated by the Tractor Lease were not suitable for Wayfair's business.[235] Kuntz has not meaningfully addressed those points. Kuntz has failed

---

[233] According to Schenk, drivers could not freely move from Schneider to W&S due to regulatory requirements and other training and logistical issues. Tr. 491:2–492:18 (Schenk) ("So you couldn't just willy-nilly move a driver over."); *see also infra* II.A.4.

[234] Tr. 1060:10–1061:4 (Elkins):

> Q. Do you believe that the leasing of those open tractors was a significant contributing factor to the increase in purchased transportation costs from February to March?
>
> A. No, I do not.
>
> Q. And why is that?
>
> A. So trucks themselves aren't . . . —they don't drive themselves. This would have been more driver-focused, meaning— . . . that big of a spike, though it's only $2 1/2 million, but you look at it on a percent base, that's really hard and tough to service in a period of time of 30 days or even, say, 60 days to get drivers in, trained on the equipment to be able to service that kind of a revenue increase.

[235] *Id.* at 1013:14–1014:7 (Elkins):

> Q. And straight trucks do a lot of consumer deliveries. Is that fair?
>
> A. Yes, consumer deliveries and setups, yes.
>
> Q. Did the Wayfair freight involve a lot of consumer deliveries?
>
> A. Yes.
>
> Q. . . . Would you believe, then, that the purchased transportation costs in March 2017 that my colleague showed you would partly be made of increases from straight truck purchased transportation?

to demonstrate that W&S would have kept Wayfair's business but for the Tractor Lease. Based upon the evidence, Kuntz has not shown that the leasing of 70 tractors pursuant to the Tractor Lease constituted a transfer or disposition of a material portion of W&S's assets in violation of the Material Asset Covenant.

### b. Reallocating Space Within the Fontana Terminal

Prior to the sale of the Acquired Companies, W&S built a new terminal facility in Fontana, California. W&S constructed the Fontana Terminal to accommodate growth, and chose the location because of its proximity to the Southern California ports, which receive freight being shipped from China and Vietnam—countries from where a large percentage of furniture manufacturers ship their goods.[236] W&S sought to maximize efficiencies at the new terminal, such as minimizing the frequency with which freight was handled, thus reducing the risk of damage.[237] Incoming freight was unloaded from manufacturers' inbound trailers on

---

A. That's a fair assessment, yes.

Q. And you would not have been able to use those open truck tractors without drivers to cover the Wayfair freight, would you?

A. No, sir, would not be able to.

None of the trucks that were part of the Tractor Lease included straight trucks that would have been suitable for Wayfair deliveries. *Compare* JX 175.00003–.00005 (schedule of trucks part of Tractor Lease, consisting of three models: Volvo D13, Volvo Cummins, and Freightliner Cascadia), *with* JX 256.00002–.00006 (list of W&S leased trucks where no straight trucks are the models included in the Tractor Lease).

[236] Tr. 34:6–19, 38:19–39:2 (Kuntz).

[237] Darlington Aug. 22, 2019 Dep. 21:17–21.

one side of the terminal and then directly loaded onto outbound trailers on the other side of the terminal.[238] This process was most efficient when all of the doors at the Fontana Terminal were available to W&S.[239]

Schneider also had a nearby terminal in Rancho Cucamonga for its automotive parts division.[240] The lease at that terminal was close to its expiration.[241] Following the closing of the W&S acquisition, Schneider consolidated the operations of the two terminals into Fontana.[242] After the consolidation, W&S lost approximately 21 of its 49 dock doors and 120,000 square feet of warehouse space.[243]

Kuntz argues that the space W&S lost at the Fontana Terminal materially and negatively affected its cost-cutting operations,[244] and constituted a transfer of a material asset. Once Schneider reduced the number of terminal doors dedicated to W&S, W&S was no longer able to benefit from its operational efficiencies, which consequently slowed down the time it took to unload and load its tractors.[245]

---

[238] Tr. 363:21–364:12 (Darlington).

[239] Darlington Aug. 22, 2019 Dep. 21:21–23:11

[240] Tr. 509:10–22 (Schenk), 955:3–22 (Elkins).

[241] *Id.* at 395:22–396:2 (Darlington).

[242] *Id.* at 152:3–11 (Kuntz).

[243] DDX 8. Kuntz asserts that it was unable to use 22 dock doors after the consolidation, but does not cite to any evidence when making this assertion. *See* Def.'s Op. Br. 70; Def.'s Ans. Br. 49. DDX 8 shows that 21 terminal doors were transferred to Schneider's automotive division.

[244] Def.'s Op. Br. 70–71.

[245] Tr. 369:6–371:7 (Darlington).

According to Kuntz, this increased handling of freight also raised the risk that it would be damaged in transport.[246] Kuntz also asserts that the Fontana Terminal was particularly valuable to W&S's operations, and due to the fewer available terminal doors, W&S was more frequently required to process freight that arrived in Fontana elsewhere, further raising costs.[247] Ultimately, Schneider provided W&S with additional terminal space in Myrtle, Mississippi, which Kuntz contends added thousands of miles to its delivery routes and increased handling costs.[248]

Schneider contests Kuntz's claim as a matter of law and fact. Schneider maintains that it had "sound business reasons" for consolidating its operations into the Fontana Terminal.[249] According to Schneider, it did not make sense to operate two terminals within about ten miles of each other in an expensive real estate market.[250] Schneider also argues that W&S's use of the Fontana Terminal was not efficient.[251] W&S was running only two shifts of dock labor, rather than three.[252] Schneider presented evidence that, even before the consolidation, the Fontana

---

[246] Def.'s Ans. Br. 50; *see* Vinci Oct. 2, 2019 Dep. 89:16–90:15.

[247] Shenck Aug. 23, 2019 Dep. 29:12–31:13; Tr. 34:20–36:16, 154:13–157:6 (Kuntz).

[248] JX 189.00001; Def.'s Op. Br. 50; Tr. 153:1–17, 156:2–157:6 (Kuntz).

[249] Pl.'s Op. Br. 66–68.

[250] *See* Tr. 955:23–956:12 (Elkins).

[251] Pl.'s Op. Br. 67–68.

[252] Tr. 396:15–17 (Darlington); *id.* at 957:13–22 (Elkins); *see* Pl.'s Op. Br. 68; JX 236.00021–23.

Terminal experienced freight backups, had challenges with staffing, and experienced parking problems around the facility.[253] Schneider observes that the consolidation of facilities was among the synergies that the parties had contemplated before the transaction.[254] Schneider also notes that W&S was provided with additional space at a terminal in Dallas, Texas.[255]

Schneider's legal argument turns on the language of the Operating Covenants and the parties' negotiations. Schneider argues that during the give-and-take over the terms of the Operating Covenants, it had struck Sellers' proposed language that would have prohibited Schneider from closing "a key terminal."[256] Thus, Schneider contends that closing terminals was a right that it expressly reserved, and Sellers cannot now seek to renegotiate that right through litigation. *See GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *7 (Del. Ch. June 21, 2012) ("a party may not come to court to enforce a contractual right that it did not obtain for itself at the negotiating table"). Essentially, Schneider contends that preserving its greater right to close a key terminal included the lesser right to reduce W&S's dedicated space at a key terminal.

---

[253] Tr. 390:15–391:10, 396:18–397:11, 398:2–22 (Darlington); *id.* at 954:21–955:2 (Elkins); *see* JX 236.00020–21.

[254] Tr. 510:4–11 (Schenk).

[255] Pl.'s Op. Br. 68; Tr. 959:11–18 (Elkins).

[256] Pl.'s Op. Br. 65; *see* JX 98.00010, 103.00079.

Schneider's argument has persuasive force with respect to Kuntz's claim that the consolidation of the Fontana Terminal violated the Material Asset Covenant.[257] As in *GRT*, reading the Material Asset Covenant as preventing Schneider from consolidating the Fontana Terminal operations would effectively read into that provision an obligation that Schneider expressly rejected. *GRT*, 2012 WL 2356489, at *8.

In addition, Kuntz has not satisfied his evidentiary burden to establish that the consolidation of the Rancho Cucamonga and Fontana terminals effected a transfer of a material asset in violation of the Material Asset Covenant.

Schneider's consolidation of the Fontana Terminal was an example of the failure to integrate the W&S operations into Schneider's business. The result surely made W&S less efficient and more costly to operate. But Kuntz has not specifically quantified the magnitude of the Fontana Terminal consolidation on W&S. In alleging the damage that Schneider's actions caused, Kuntz contends that "[a]

---

[257] Kuntz argues that this case is distinguishable from *GRT*. There, the parties (Marathon and GRT) expressly discussed the text that Marathon struck in a draft term sheet following that draft's circulation. *GRT*, 2012 WL 2356489, at *7. "Following this exchange with Marathon, GRT gave up that point. . . . Even GRT's principal negotiator of the term sheet acknowledged that fact." *Id.* Kuntz's brief attempts to distinguish *GRT*, but only as to the Tractor Acquisition Covenant. *See* Def.'s Ans. Br. 50–51. Kuntz is correct that *GRT* is inapplicable as to the Tractor Acquisition Covenant, as there is no evidence that anyone on the Sellers' side understood that they were giving up their bargained-for agreement requiring Schneider to acquire 60 growth tractors during each Measurement Period. Kuntz did not distinguish *GRT*, however, as to the Material Asset Covenant and, specifically, the consolidation of the Fontana Terminal operations.

63

trucking company's terminals . . . are critical to its operations and profitability" and that rearranging the Fontana Terminal increased W&S's costs.[258] But Kuntz does not attempt to quantify those specific costs. Because those costs remain unquantified, Kuntz cannot compare them to any collection of assets or financial metrics to assert that those costs were indeed material. The gravamen of Kuntz's evidence consists of testimony making general statements regarding the inefficiencies caused by the rearrangement of the Fontana Terminal; none of this testimony quantifies the costs of this change.[259] This evidence does not satisfy

---

[258] Def.'s Op. Br .70–71; Def.'s Ans. Br. 48–50.

[259] *See e.g.*, Vinci Oct. 2, 2019 Dep. 89:12–90:18:

> We would be able to load more trailers without having to double handle any freight. So we can go straight from a pickup trailer without hitting the floor first. That would, you know, reduce opportunity for damage, and speed up transit time. So having more doors is a big thing in our industry. . . . [T]he more you handle freight, the more opportunity for damage there is. And by having less doors, you're going to have to hit the floor, as we call it, more often than just swinging it into another trailer. . . .
>
> Q. Can having less doors impact transit time?
>
> A. It can, yeah.

*See* Darlington Aug. 22, 2019 Dep. 25:7–23:

> Q. Did [the rearrangement of the Fontana Terminal] impact profitability of [a trucking] division?
>
> A. Well, it impacted service. So when you impact service, generally anything in transportation, you're subject to losing revenue if you don't react to it quick enough.
>
> Q. How did it impact service?
>
> A. Took longer to unload trailers. Instead of picking something up today and unloading it the same day . . . we would then be unloading some of that

Kuntz's burden to prove by a preponderance of the evidence that the consolidation of the Fontana Terminal effected a transfer of a material W&S asset. Therefore, I find that Schneider did not breach the Material Asset Covenant.

### 3. The Business Continuity Covenant

The Business Continuity Covenant prohibited Schneider from materially changing the "type or nature" of any Acquired Company's business until the conclusion of all the Measurement Periods.[260] Kuntz contends that Schneider breached this covenant, too, and relies heavily on Schneider's consolidation of operations at the Fontana Terminal and the Tractor Lease. According to Kuntz, Schneider "materially altered W&S's operations by transferring dock doors and tractors, and by failing to acquire seated tractors to keep up with demand."[261] This argument, however, fails to consider the difference between W&S's business and its operations.

As discussed above, the Tractor Lease and consolidation of operations at the Fontana Terminal affected W&S's operations.[262] Kuntz has not shown, however,

---

freight the second and third day before we got it shipped out. . . . [W]e added a third shift down there because of it, and that was hard to fill, too, at the same time—all at the same time. So trying to hire and bring that all in together was challenging.

[260] SPA, Ex. E.

[261] Def.'s Op. Br. 71.

[262] *See supra* II.B.2.

that this resulting change in W&S's operations altered the type or nature of its business.[263] Nor has Kuntz argued how broad the scope of a business should be and how significantly the business must change to materially alter its type or nature. At trial, Hutchinson—Sellers' counsel and principal negotiator—testified that when he proposed the Business Continuity Covenant, he understood "type" to be "a broad concept": "So they had to stay in the trucking business. They couldn't move to the restaurant business, for example."[264] And he understood "nature" to mean "the character of the business": "So in this instance, we had a smaller business that was in a discrete portion . . . of the trucking industry, supporting e-commerce companies, moving furniture, et cetera."[265] Neither party disagrees with Hutchinson's interpretation of this covenant, which reflects a reasonable reading of the text.[266]

Kuntz does not suggest that W&S's business was so significantly affected that it no longer resembles a trucking business. Therefore, in order for Schneider to have violated the Business Continuity Covenant, Schneider's actions must have materially altered the character of W&S's business so that it was not serving the same discrete segment of the trucking industry that it previously had *i.e.*, supporting e-commerce, moving furniture, etc. Kuntz has not presented evidence that W&S

---

[263] *See* SPA, Ex. E.

[264] Tr. 290:6–13 (Hutchinson).

[265] *Id.* at 290:14–21 (Hutchinson).

[266] *See* Pl.'s Op. Br. 55 (relying on Hutchinson's interpretation).

began serving a different segment of the trucking industry. Rather, he argues that because of Schneider, W&S lost business within the segment that it had historically served.[267] Kuntz has persuasively shown that Schneider failed on many levels to integrate W&S into its existing business model. But proving an integration failure is not enough to sustain Kuntz's burden on this claim. Kuntz has not proven that these integration failures resulted in a change in the nature of W&S's business so as to constitute a breach of the Business Continuity Covenant.

---

[267] *See* Def.'s Op. Br. 45–46 ("The decline in W&S's overall tractor capacity exacerbated truck shortages, leading to the higher costs, lower profitability, delays, and customer defections."); *id.* at 50 ("W&S was forced to reroute freight . . . despite the fact that it added thousands of miles and significant additional handling costs. This lead [*sic*] to serious shipping issues. The Fontana dock doors and space that Schneider transferred was material to W&S's business, and its disposition negatively impacted W&S's performance.").

Kuntz also points to Schneider's order to slow the opening of new W&S accounts as proof that Schneider was intentionally impeding W&S's growth. *See id.* at 53, 72; JX 202.00001; Tr. 180:22–183:5, 186:11–187:10 (Kuntz). The consequence of that action would have been a change in the amount of business that W&S was doing, not a pivot in the type or nature of W&S's business. Furthermore, Kuntz mischaracterizes the extent of Schneider's order. Kuntz refers to this order as a "Stop Sell Order," which "prohibit[ed] W&S from taking on new customers." Def.'s Op. Br. 72. Schneider only ordered W&S to *temporarily* cease taking on new customers until it could catch up on processing its outstanding orders. When Elkins asked Sheri Gerondale of Schneider if W&S was being ordered to "not go after new accounts," she responded that this was incorrect: "No not stopping selling. But absolutely slowing the pipeline of when business starts to be implemented and hits the terminal and first mile network. We did not eliminate anyone but held out on final decision criteria pending profitability analysis data." JX 202. Kuntz himself admitted at trial that Schneider's order was only temporary. Tr. 181:14–18 (Kuntz); *see also id.* at 386:1–6 (Darlington) ("There was a pause in [taking on new customers] for . . . 90 days . . . is what period of time that we were to use that to try to get ourselves caught up.").

### 4. The Synergy Covenant

The Synergy Covenant required Schneider to "work in good faith . . . to seek to capture synergies available to the Acquired Companies."[268] Schneider cannot be found to have breached the Synergy Covenant if it "[w]ork[ed] in good faith" to help W&S capture synergies as a result of the acquisition.[269] The Synergy Covenant provides examples of the synergies that Schneider might pursue, such as cost savings through its purchasing power, *i.e.*, savings on fuel, tires, equipment, and insurance, and assisting W&S in its driver recruiting efforts and safety initiatives.[270]

The evidence shows that Schneider made efforts to capture synergies under the Synergy Covenant. Soon after the acquisition, Schneider formulated a plan to track and achieve expected cost synergies related to fuel, tires, tractors, equipment, insurance, facilities, and labor.[271] Less than a year later, Schneider realized cost-saving synergies that exceeded those expectations.[272] As part of its initial plan, Schneider introduced "safety and performance objectives to improve productivity."[273] Schneider undertook efforts to improve W&S's driver recruiting,

---

[268] SPA, Ex. E.

[269] *See id.*

[270] *See id.*

[271] *See* JX 128.00012–15.

[272] JX 157.00003; Tr. 646:11–22 (Rourke).

[273] JX 128.00013.

utilizing the resources and strategies that it had devised to recruit its own drivers.

First, Schneider combined its recruiting department with those of W&S.[274]  Next,

Schneider extended to W&S's prospective driver pool the same incentives that

Schneider offered to its own prospective drivers (*e.g.*, tuition reimbursement, sign-

on bonuses, referral program)[275] in addition to those it had already added before

consolidating its recruiting departments.[276]  After Schneider recognized that it was

struggling to hire enough W&S drivers, it planned recruiting events solely dedicated

to recruiting for W&S.[277]

Kuntz does not refute these examples of Schneider's good faith attempts to

capture, and sometimes achieve, synergies.  Instead, he recycles many of his

previous arguments.  Kuntz asserts that Schneider should have purchased more

tractors for W&S rather than increasing costs by leasing tractors from third-party

carriers, should not have consolidated space at the Fontana Terminal and leased

tractors from W&S, and should have transferred drivers from its other affiliates to

W&S when its recruiting efforts were not achieving their desired results.[278]  Again,

these shortcomings reflect a failed integration of W&S into Schneider's operations

---

[274] JX 176; Tr. 931:10–932:13 (Elkins).

[275] JX 179.

[276] *See* JX 150.00001.

[277] *See* JX 195; Tr. 498:4–501:22 (Schenk).

[278] Def.'s Op. Br. 71–72.

and perhaps poor planning and decision-making, not bad faith. Purchasing new tractors for W&S's exclusive use would not capture any synergy relating to Schneider's existing resources. Maintaining the status quo at the Fontana Terminal was likewise immaterial from a synergistic perspective. Nor did the Synergy Covenant obligate Schneider to transfer drivers to W&S from other affiliates. Driver recruitment was just one example suggested by the Synergy Covenant. Even if Schneider chose to pursue this synergy, Schneider was not required to achieve it through transferring drivers rather than attempting to recruit new ones.

From the transaction's closing, Schneider stated that its "key guiding principles for the integration plan" were to "support W&S and Lodeso revenue and earnings growth," detailing a plan to accomplish this through realizing synergies.[279] Schneider's inability to execute the integration plan is attributable to several factors, but there is no credible evidence that it was due to a lack of the good faith that the Synergy Covenant required. Schneider did not breach the Synergy Covenant.

### B. The Implied Covenant of Good Faith and Fair Dealing Claim

Kuntz argues that, to the extent the court does not find that Schneider breached the Operating Covenants, it should nevertheless find that Schneider's actions breached the contractual implied covenant of good faith and fair dealing.[280]

---

[279] *See* JX 128.00012–15.

[280] Def.'s Op. Br. 73.

Specifically, Kuntz alleges the following post-acquisition conduct establishes Schneider's breach: (1) failing to acquire 60 growth tractors during each Measurement Period; (2) the ordering of W&S to slow down and temporarily halt taking on new customers; (3) consolidating its operations within the Fontana Terminal resulting in fewer terminal doors for W&S; (4) the insufficient hiring of drivers for W&S; and (5) the execution of the Tractor Lease. Kuntz contends that these actions, or failures, are not merely due to a failure to integrate W&S with Schneider's business, or even incompetence, but, instead, bad faith.

Every contract governed by Delaware law is subject to the implied covenant of good faith and fair dealing. *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441–42 (Del. 2005). The implied covenant of good faith and fair dealing "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Id.* at 442 (internal quotations omitted). The implied covenant is used to "infer contract terms to handle developments or contractual gaps that . . . neither party anticipated." *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (internal quotations omitted). It applies only where a contract "lacks specific language governing an issue and the obligation the court is asked to imply advances, and does not contradict, the purposes reflected in the express language of the contract." *All. Data Sys. Corp. v. Blackstone Cap. P'rs V L.P.*, 963 A.2d 746, 770

(Del. Ch. 2009), *aff'd*, 976 A.2d 170 (Del. 2009).  Thus, the doctrine "ensures that the parties deal honestly and fairly with each other when addressing gaps in their agreement." *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021).  To prevail on this claim, Kuntz must prove "'a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.'" *Buckeye P'rs, L.P. v. GT USA Wilmington, LLC*, 2022 WL 906521, at *21 (Del. Ch. Mar. 29, 2022) (quoting *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)).

The implied covenant is a "limited and extraordinary legal remedy and not an equitable remedy for rebalancing economic interests that could have been anticipated." *Glaxo Grp.*, 248 A.3d at 920 (internal quotations and citations omitted).  The implied covenant "cannot be used to circumvent the parties' bargain," and "[i]t must be clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter." *Lonergan v. EPE Hldgs. LLC*, 5 A.3d 1008, 1017–18 (Del. Ch. 2010) (internal quotations and citations omitted).  Therefore, this doctrine should only be utilized when "developments that could not be anticipated" by the parties occur, "not developments that the parties simply failed to consider." *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).  "Even where the contract is silent, an interpreting

72

court cannot use an implied covenant to re-write the agreement between the parties, and should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it." *Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 507 (Del. 2019) (internal quotations and bracketing omitted). The implied covenant is thus only applied to a narrow set of circumstances: "where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer." *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009); *see also Nemec* 991 A.2d at 1128 ("the covenant is a limited and extraordinary legal remedy"). As the Delaware Supreme Court recently observed:

> It is one thing to imply a good faith obligation when the parties have expressly agreed that a certain act is within a party's discretion. It is another matter to imply discretion to restrict actions expressly permitted by the parties' agreement. The implied covenant imposes a good faith and fair dealing obligation when a contract confers discretion on a party. It should not be used to imply terms that modify or negate an unrestricted contractual right authorized by an agreement.

*Glaxo Grp.*, 248 A.3d at 920–21(citations omitted).

"Despite the appearance in its name of the terms 'good faith' and 'fair dealing,' the covenant does not establish a free-floating requirement that a party act in some morally commendable sense. Nor does satisfying the implied covenant necessarily require that a party have acted in subjective good faith." *Allen v. El Paso*

73

*Pipeline GP Co.*, 113 A.3d 167, 182–83 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (TABLE); *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at \*17 (Del. Ch. Nov. 17, 2014) ("A breach of the implied covenant also does not necessarily require that a party have acted in bad faith."). Rather, these terms connote that a party take actions that are consistent with the agreement and its purpose. *MHS Cap. LLC v. Goggin*, 2018 WL 2149718, at \*11 (Del. Ch. May 10, 2018). Thus, "[w]hen exercising a discretionary right, a party to the contract must exercise its discretion reasonably." *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 419 (Del. 2013) (quoting and adopting the reasoning in *ASB Allegiance Real Est. Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 440–42 (Del. Ch. 2012), *rev'd on other grounds*, 68 A.3d 665 (Del. 2013)), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013).

The first inquiry in an implied covenant claim is "whether there is a gap that needs to be filled." *Allen*, 113 A.3d at 183. If the contract expressly addresses a particular issue, there is no gap to fill and the implied covenant does not apply. *Buckeye*, 2022 WL 906521, at \*21 (citing *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at \*10 (Del. Ch. May 7, 2008), *aff'd*, 984 A.2d 124 (Del. 2009)). Kuntz contends that the implied covenant is applicable because "the parties never contemplated that Schneider would or could affirmatively interfere with W&S's

74

ability to conduct its business in the ordinary course."[281]  Kuntz's argument ignores

the contract and the parties' negotiations.

The SPA expressly provides that:

> During each Measurement Period, the Buyer shall operate the Acquired Companies and Lodeso in the manner provided for on **Exhibit E**.  Each Seller acknowledges and agrees that (i) so long as the Buyer operates the Acquired Companies and Lodeso in such manner, the Buyer, the Acquired Companies and each of their respective Affiliates will have the right to otherwise operate their business *as they see fit* and will have no obligation (fiduciary or otherwise) to act in any manner in an attempt to protect or maximize any payments under this [contingent payment provision].[282]

Exhibit E (*i.e.*, the Operating Covenants) are limited to the Tractor Acquisition

Covenant, the Synergy Covenant, the Material Asset Covenant, and the Business

Continuity Covenant.  Only the Synergy Covenant contains a "good faith"

requirement.

The SPA expressly addresses the Tractor Acquisition Covenant, and thus that

covenant cannot serve as the basis for an implied covenant claim over the acquisition

of tractors.[283]  Similarly, the Synergy Covenant also addresses driver recruitment

---

[281] Def.'s Op. Br. 73.

[282] SPA § 2.4 (e) (emphasis in original).

[283] Although Kuntz suggests that Schneider's "failing to grow W&S's fleet by 60 class 8 tractors during each Measurement Period" might have been a breach of the implied covenant, he concedes that the other four grounds for this claim are more tenable. *See* Def.'s Op. Br. 73.  I agree.  Although the Tractor Acquisition Covenant was ambiguous, it did not merely "suggest an obligation and point to a result," which would be fitting for an implied covenant analysis. *See Airborne Health*, 984 A.2d at 146.  Both parties agree that

75

and contains its own good faith requirement. Thus, there is no gap for the implied covenant to fill there either.[284] The SPA does not expressly address the acts or omissions that serve as the basis for the remaining three alleged violations of the implied covenant, but that does not mean that the implied covenant applies. "The implied covenant should not be used to fill the gap left by a rejected term because doing so would grant a contractual right or protection that the party 'failed to secure . . . at the bargaining table.'" *Buckeye*, 2022 WL 906521, at *21 (quoting *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004), *aff'd*, 861 A.2d 1251 (Del. 2004)).

"[A]ny argument by a party that another party breached an implied term invites consideration of evidence of the parties' bargaining history." *Nationwide Emerging Managers, LLC v. Northpointe Hldgs., LLC*, 112 A.3d 878, 897–98 (Del. 2015). The bargaining history is fatal to Kuntz's implied covenant claim. It demonstrates that the parties *did* contemplate Schneider's rights in conducting W&S's business post-acquisition. Sellers' lead negotiator, Hutchinson, testified that

---

the Tractor Acquisition Covenant obligated Schneider to purchase 60 new tractors during each Measurement Period. Their disagreement is confined to whether Schneider should have also replenished any tractors that W&S lost during those Measurement Periods. And that disagreement is centered on a matter of contractual ambiguity, *i.e.*, growth vs. gross tractors—not gap filling. *See supra* II.A.1; *Nemec*, 991 A.2d at 1126.

[284] Kuntz merely disputes the effectiveness of Schneider's hiring methods. As explained earlier in the discussion of the Synergy Covenant, Schneider took extensive efforts to recruit and hire W&S drivers. Kuntz has not presented credible evidence that Schneider's efforts lacked good faith. *See supra* II.A.4.

the parties discussed during the contract negotiations "how the business would be operated to help ensure [W&S] had the ability to meet those earn-out targets."[285] He also stated that the Sellers placed particular importance on the "transfer of major assets out of [W&S]" and an "increase in the aggregate fleet size."[286] In the first markup of the SPA that W&S sent to Schneider, W&S added a footnote addressed to Schneider asking it to "propose additional post-closing operational covenants (e.g., covenant to continue to operate the business on a stand-alone, independent basis; covenant to provide appropriate equipment purchase support; etc.)" under the section that formulated the Earnout Payments.[287] W&S was aware that how Schneider operated W&S post-closing could be critical to achieving the Earnout Payments' EBITDA Targets. Thus, W&S negotiated what eventually became the Operating Covenants to constrain Schneider's freedom in operating the Acquired Companies during each Measurement Period.

During their negotiations, the parties exchanged drafts of the SPA that specifically addressed Schneider's operation of W&S's business post-closing. Sellers' May 25, 2016 draft of the SPA proposed the following additional covenants (the "Rejected Covenants"):

---

[285] Tr. 270:11–14 (Hutchinson).

[286] *See id.* at 270:1–271:3 (Hutchinson).

[287] JX 65.00026.

Buyer shall not, and shall not permit any of the Acquired Companies or any of the Buyer's Affiliates to:

. . .

4.  Unreasonably require any Acquired Company to cut staff, capital expenditures or general and administrative expenses, close a key terminal, or take other actions that are not commercially reasonable . . . and/or a prudent business practice;

5.  Require or allow any Acquired Company to engage in any activity for the purpose of increasing the long-term growth of the business of any Acquired Company, the Buyer or any of their respective Affiliates at the expense of maximizing the contingent payments that may be made to the Sellers' Representative . . . under [the section of the SPA governing the earnout payments]; or

6. Materially change, modify or alter any Acquired Company's pricing, marketing, sales, financing or operations in such as manner as would reasonably be expected to hinder or impair in any material respect its achievement of the EBITDA Targets or the maximization of the contingent payments that may be made to the Sellers' Representative . . . under [the section of the SPA governing the earnout payments].[288]

Schneider struck all of these covenants,[289] several of which correspond to the arguments underlying Kuntz's implied covenant claim.

The SPA expressly permitted Schneider to operate the Acquired Companies as it saw fit. Sellers proposed, and Schneider rejected, covenants expressly designed to limit Schneider's decision-making so as not to materially "hinder or impair" achievement of the Earnout Payments, including sacrificing the Earnout Payments

---

[288] JX 98.00009–10 (formatting).

[289] JX 103.00079–80.

for long-term growth. Schneider ordered W&S to temporarily slow down W&S's customer acquisitions due to the "stress [its] network was under" and to ensure that any new customer accounts would be profitable.[290] Because the parties contemplated, but ultimately decided against, including language restricting Schneider's ability to make operational changes that would prioritize long-term growth and potentially risk achievement of the Earnout Payments, the implied covenant is inapplicable here.

The Rejected Covenants also contemplated restrictions on conduct that Kuntz asserts as the basis for the remaining alleged breaches of the implied covenant. Covenant four would have prohibited Schneider from causing W&S to make certain business decisions, such as "[u]nreasonably" closing a key terminal, cutting staff, or failing to make capital expenditures. The parties considered and rejected restricting Schneider's ability to make these types of operational decisions for W&S. Thus, "the drafting history resolves any uncertainty about whether the parties would have agreed to be bound by contractual language" placing limitations on Schneider's ability to make decisions regarding W&S's operations *i.e.*, allocating terminal doors, leasing trucks, and staffing. *Nationwide*, 112 A.3d at 898. Therefore, the implied covenant of good faith and fair dealing is inapplicable.

---

[290] JX 202; *see* Tr. 965:5–967:22 (Elkins).

Kuntz argues that the court should find that Schneider breached the implied covenant based on the holdings in *American Capital Acquisition Partners, LLC v. LPL Holdings, Inc.*, 2014 WL 354496 (Del. Ch. Feb. 3, 2014), and *Keating v. Applus+ Technologies, Inc.*, 2009 WL 261091 (E.D. Pa. Feb. 4, 2009). In *American Capital*, the court concluded that the plaintiff stated an implied covenant claim with allegations that the acquirer "pivoted" sales from the acquired company, discouraged clients from using the acquired company's services, and transferred employees from the acquired company to a different subsidiary of the acquirer, all in an effort to avoid triggering earnout payments as part of a stock purchase agreement. 2014 WL 354496, at *6–7. The court reasoned that "had the parties contemplated that the [acquirer] might affirmatively act to gut [the acquired entity] to minimize [contingent] payments . . . , the parties would have contracted to prevent [the acquirer] from shifting revenue from [the acquired company]" so as to avoid making the contingent payments. *Id.* at *7.

In *Keating*, a stock purchase agreement entitled the sellers to earnout payments derived from contracts entered during a six-year period after closing. *Keating*, 2009 WL 261091, at *1. Sellers alleged that the acquirer breached the implied covenant by purposefully delaying its (ultimately successful) bid for a government contract near the expiration of the six-year period so as to avoid making the earnout payments. *Id.* The court, applying Delaware law, observed that the stock

80

purchase agreement granted the acquirer "unqualified discretion in deciding which contracts to pursue and when to pursue them." *Id.* at *4. The court held that the acquirer "had a duty to exercise its discretion reasonably," and could not avoid its contractual obligations "by creating, in bad faith, an outcome that technically satisfies the express terms of the [stock purchase agreement], but deprives [the sellers] of their legitimate expectations." *Id.* Whether the acquirer did so "require[d] a fact-intensive inquiry not appropriate in deciding a motion to dismiss." *Id.*

*American Capital* and *Keating* do not support Kuntz's implied covenant claims. First, both opinions involved a motion to dismiss, not a trial on the merits. Second, unlike in those cases, all of Kuntz's implied covenant claims arise from the Operating Covenants that Kuntz heavily negotiated. Third, Kuntz did not prove that Schneider affirmatively acted to gut the W&S business or purposefully acted in bad faith to avoid making the Earnout Payments.

The misconduct that Kuntz alleges Schneider engaged in under his implied covenant theory is identical to that which he alleges under the Operating Covenants.[291] In this instance, though, Kuntz also asserts that Schneider's

---

[291] *Compare* Def.'s Ans. Br. 59–62, *with* Def.'s Op. Br. 42–54, 66–72.

81

misconduct was carried out with "subjective bad-faith."[292]  Kuntz has fallen well short of establishing his evidentiary burden.[293]

Kuntz's continued assertion that Schneider stopped accepting new orders for W&S business is factually flawed and does not establish an implied covenant claim. First, Kuntz mischaracterizes what he refers to as the "Stop Sell Order."  The record showed that Schneider only temporarily halted W&S's customer acquisitions and never sabotaged W&S's ability to enlarge its business.[294]  Nor does Kuntz explain how Schneider's consolidation of operations at the Fontana Terminal and execution of the Tractor Lease were decisions lacking in good faith.[295]  Instead, as discussed in detail above, these decisions reflected a poorly executed integration of the

---

[292] *See* Def.'s Ans. Br. 57.

[293] In his answering brief, Kuntz raises for the first time the theory that Schneider's acquisition of W&S enabled it to funnel dividends to the Schneider family and facilitated Schneiders' initial public offering.  Def.'s Ans. Br. 57–58.  Kuntz appears to offer this theory as a retort to Schneider's argument that it would be implausible to think that Schneider would pay $125 million to acquire W&S, spend millions more to integrate the business, intentionally operate the business at a loss, only to then shut it down just to avoid making Earnout Payments.  Pl.'s Op. Br. 72.  Kuntz did not connect the factual dots in any persuasive way to prove his new theory.  Furthermore, since it was raised for the first time in the answering brief, it was not fairly presented.  *See Zhou v. Deng*, 2022 WL 1024809, at *17 (Del. Ch. Apr. 6, 2022) (deeming an argument raised for the first time in a post-trial reply brief waived); *In re IBP, Inc. S'holder Litigation*, 789 A.2d 14, 62 (Del. Ch. 2001) (deeming an argument not raised in the opening post-trial brief waived).

[294] *See supra* note 267.

[295] *See* Def.'s Ans. Br. 59–60.

Acquired Companies into the larger Schneider business. Kuntz has not satisfied his burden to establish a breach of the implied covenant.[296]

## C.     Kuntz Is Entitled to an Award of Attorneys' Fees and Expenses

Delaware law generally follows the American Rule that litigants must pay their own attorney's fees. *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 545 (Del. 1998). An exception to the general rule arises when parties agree to fee shifting in a contract. *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007). Kuntz invokes that exception.

Kuntz argues that Section 7.1 of the SPA obligates Schneider to compensate him for his attorneys' fees for a breach of any of the Operating Covenants.[297] Section 7.1 is an indemnification provision. Kuntz relies on Section 7.1(c), which states, in pertinent part:

> the buyer will indemnify and hold harmless the Sellers . . . from and against any and all Losses incurred or suffered by any Seller Indemnified Party based upon, arising out of, or otherwise in respect of any . . . breach of any covenant (including making any Deferred Consideration Payment, or any required Annual Contingent Payment [Earnout Payment] or Annual Contingent True-Up Payment).[298]

---

[296] Because Kuntz has failed to prove conduct that would demonstrate breach of the implied covenant of good faith and fair dealing, the court need not reach Schneider's argument that Kuntz has failed to prove damages from any such breach.

[297] *See* Def.'s Op. Br. 80–81.

[298] SPA § 7.1(c).

"Losses" is defined to include "reasonable fees and disbursements of legal counsel."[299]   Kuntz argues that his attorneys' fees and expenses are Losses that Schneider must pay as a result of its breach of the Tractor Acquisition Covenant.

Schneider insists, however, that Section 7.1 is a standard indemnity clause that does not qualify as a contractual fee-shifting provision.  Schneider relies on a line of cases, starting with *TranSched Systems Ltd. v. Versyss Transit Solutions, LLC*, 2012 WL 1415466 (Del. Super. Mar. 29, 2012), holding that a general indemnity clause in a contract does not act as a fee-shifting provision for litigation between the contracting parties (frequently referred to as "first-party claims") unless the language unequivocally so states.  Under these cases, "indemnity agreements are presumed not to require reimbursement for attorneys' fees incurred as a result of substantive litigation between the parties to the agreement absent a clear and unequivocal articulation of that intent."  *Id.* at *2; *accord Deere & Co. v. Exelon Generation Acquisitions, LLC*, 2016 WL 6879525, at *1 (Del. Super. Nov. 22, 2016) ("Standard indemnity clauses are not presumed to apply to first-party claims. Otherwise, a typical indemnification provision would swallow the American Rule." (internal quotations omitted)); *Data Centers, LLC v. 1743 Hldgs. LLC*, 2015 WL 9464503, at *6 (Del. Super. Nov. 20, 2015) ("Absent specific language showing

---

[299] *Id.* at 8.

intent to extend the protections of an indemnity provision to claims brought against parties to the contract, the Court will interpret the indemnity provision as applying to third party claims only."); *SARN Energy LLC v. Tatra Defence Vehicle A.S.*, 2019 WL 6525256, at *1 (Del. Super. Oct. 31, 2019) (concluding the indemnity provision was not a valid fee-shifting provision because it was not "a clear and unequivocal agreement in connection with a dispute between parties involving a failure to fulfill obligations under the contract"); *Winshall v. Viacom Int'l Inc.*, 2019 WL 5787989, at *5 (Del. Super. Nov. 6, 2019) ("[T]here is no explicit language that [the indemnity provision] applies to the reimbursement of attorneys' fees and expenses on first-party claims between the parties. Instead, [the provision] applies to third-party claims brought against the parties relating to indemnifiable Losses."), *aff'd on other grounds*, 237 A.3d 67 (Del. 2020) (TABLE); *In re Bracket Hldg. Corp. Litigation*, 2020 WL 764148, at *16 (Del. Super. Feb. 7, 2020) ("Without precise language setting forth an intent to shift fees, counsel should not expect the Court to deviate from the American Rule if care has not been taken in drafting a contract's language." (internal quotations and bracketing omitted)); *Ashland LLC v. Samuel J. Heyman 1981 Continuing Tr. for Heyman*, 2020 WL 6582958, at *6 (Del. Super. Nov. 10, 2020) ("[A] party is not entitled to attorneys' fees under an indemnification provision when there is no specific language in the indemnification provision . . . that covers fee-shifting." (internal quotations omitted)); *see Great Hill Eq. Partners*

85

*IV, LP v. SIG Growth Eq. Fund I, LLLP*, 2020 WL 7861336, at *5 (Del. Ch. Dec. 31, 2020) ("purely contractual indemnification provisions only shift first-party claims if the contract explicitly so provides"); *Nasdi Hldgs., LLC v. N. Am. Leasing, Inc.*, 2020 WL 1865747, at *5–6 (Del. Ch. Apr. 13, 2020) (ORDER) (noting the only fee-shifting specific language in the agreement was in the definition of "Losses," which was insufficient to warrant fee shifting under the indemnity provision); *Senior Housing Cap., LLC v. SHP Senior Housing Fund, LLC*, 2013 WL 1955012, at *45 (Del. Ch. May 13, 2013) ("Here, there is no specific language in the indemnification provision of the Management Agreements that covers fee-shifting. Therefore, I will not interpret the provision in an expansive way that would be inconsistent with the American Rule."); *see also Int'l Rail P'rs LLC v. Am. Rail P'rs, LLC*, 2020 WL 6882105, at *5–6 (Del. Ch. Nov. 24, 2020) (discussing cases and distinguishing indemnity provision contained in a limited liability company agreement), *appeal refused*, 245 A.3d 517 (Del. 2021).

The Delaware Supreme Court has not decided this issue. In *Winshall v. Viacom International, Inc.*, the Delaware Supreme Court was presented with the issue, but the Court did not need to reach it in deciding the appeal. 237 A.3d 67 (Del. 2020) (TABLE) (holding the claim for fees under the indemnity clause was "barred by a limitation on indemnification contained in the merger agreement"). Thus, *TranSched* and its progeny are binding precedent. *See Gatz Props., LLC v.*

*Auriga Cap. Corp.*, 59 A.3d 1206, 1219 (Del. 2012) ("It is axiomatic . . . that once a trial judge decides an issue, other trial judges on that court are entitled to rely on that decision as *stare decisis*."); *Leonard Loventhal Acct. v. Hilton Hotels Corp.*, 2000 WL 1528909, at *4 (Del. Ch. Oct. 10, 2000) (observing that the doctrine of *stare decisis* is applicable to "a decision of a court higher in rank, or of the same rank" (quoting 20 Am. Jur. Courts § 201 (1965)), *aff'd*, 780 A.2d 245 (Del. 2001).

Although *TranSched* requires a "clear and unequivocal articulation of . . . intent" that an indemnity provision also cover first-party claims, "there is no definitive language that must be used." 2012 WL 1415466, at *2. "Each provision is unique and must be decided under the facts of that particular case." *Id.* Kuntz contends that Section 7.1(c) demonstrates the "clear and unequivocal articulation" of the SPA's drafters to indemnify first-party disputes.[300] Section 7.1(c) contains no express reference to litigation between the parties. Section 7.1(c) also lacks any mention of "prevailing parties"—"a hallmark term of fee-shifting provisions." *See TranSched*, 2012 WL 1415466, at *3.

On the other hand, the language of the indemnity provision in the SPA is different from that considered in other cases in a few material respects. First, Section 7.1(c) does not merely require indemnity for breach of any covenant, but expressly

---

[300] Def.'s Op. Br. 81.

"includ[es] making any Deferred Consideration Payment, or any required Annual Contingent Payment or Annual Contingent True-Up Payment." The Deferred Consideration Payment, Annual Contingent Payment, and Annual Contingent True-Up Payment are payments that are made from Schneider to Kuntz.[301] None of those payments would arise from a third-party claim.

Second, the definition of "Losses" states

> in no event shall Losses include, and no Party shall be liable to any other Party or Person in respect of (a) punitive or exemplary damages or (b) any other damages that are not the reasonably foreseeable result of the event that gave rise thereto or the matter for which indemnification is sought hereunder, except in each case of the foregoing <u>clauses (a)</u> and <u>(b)</u>, to the extent any such damages are being sought in a Third-Party Claim for which a Person is entitled to indemnification under this Agreement.[302]

"Third-Party Claim" is defined as "any event or condition that could reasonably be expected to result in a Loss" that is brought by a third party.[303] Thus, the definition of "Losses" makes an express distinction between indemnifiable damages arising from third-party claims and non-third-party claims.

Third, unlike in *TranSched*, the existence of a notice-of-claim provision in the SPA does not undermine Kuntz's position. In *TranSched*, the court found that the

---

[301] SPA §§ 2.3(a) (Deferred Consideration Payment), 2.4(b) (Annual Contingent Payment), 2.4(c) (Annual Contingent True-Up Payment).

[302] *Id.* at 8.

[303] *Id.* §§ 7.1(a), (b).

88

requirement that a party seeking indemnity provide notice of the claim "makes no sense in the context of a first-party action unless used as a threat by one party to enforce its will against another." 2012 WL 1415466, at *3. In this case, however, the notice provision in the SPA specifically requires a claim notice for "any event or condition that could reasonably be expected to result in a Loss,"[304] but then addresses rights and obligations in the event that the claim notice "identifies" a third-party claim.[305] This distinction reflects that the parties understood that claims within the scope of the indemnity clause were not limited to third-party claims.

Fourth, the SPA does not provide for fee shifting elsewhere in the agreement. This distinguishes the SPA from several of the precedents, which concluded that the existence of a fee-shifting clause elsewhere in the contract, "further demonstrate[d] that the parties did not intend for Losses to encompass fee-shifting on first-party claims." *Ashland*, 2020 WL 6582958, at *7; *see also Deere*, 2016 WL 6879525, at *2 ("[T]he parties' use of specific fee-shifting language in [other sections of the agreement], and their failure to include such language in [the indemnification provision], indicates a lack of intent to create a clear and unequivocal agreement to shit fees in first-party actions."); *Paul Elton, LLC v. Rommel Delaware, LLC*, 2022 WL 793126, at *3 (Del. Ch. Mar. 16, 2022) ("Section 44 of the Lease Agreement

---

[304] *Id.* § 7.2(a).

[305] *Id.* § 7.2(b).

contains an arbitration clause that specifically awards attorneys' fees to the prevailing party in arbitration between the two, demonstrating that the parties were capable of drafting the sort of clear and unequivocal language required to shift fees when they so intended."); *Great Hill*, 2020 WL 7861336, at *6 ("Underscoring this point [that the indemnity clause did not cover first-party claims] is the fact that the parties *did* include a clear and unequivocal articulation of an intent to shift fees elsewhere in the agreement . . . ." (emphasis in original)).

The indemnification provision in the SPA does not expressly state that it covers first-party claims. But *TranSched* and its progeny do not require that an indemnity clause expressly state that it covers first-party claims. They create a presumption that an indemnity clause does not apply to first-party claims. The presumption is rebutted if the language of the agreement reveals a "clear and unequivocal articulation" of the parties' intent that it applies to first-party claims. *TranSched*, 2012 WL 1415466, at *2. The language embodying that intent must be "explicit." *Winshall*, 2019 WL 5787989, at *5; *accord Great Hill*, 2020 WL 7861336, at *5. Explicit means "[e]xpressed without ambiguity or vagueness."[306] Applying the well-established principles of contract construction to the specific facts of this case, and reading the SPA as a whole, Section 7.1(c) clearly and

---

[306] *Explicit*, BLACK'S LAW DICTIONARY (11th ed. 2019).

unambiguously reflects the parties' intent that it applies to first-party claims. Section 7.1(c)'s specific inclusion of Deferred Consideration Payments, Annual Contribution Payments, and Annual Contingent True-Up Payments is a clear indication that the parties intended Section 7.1(c) to cover claims between the contracting parties. The distinction between third-party claims in the definition of "Losses" and the notice provision, along with the absence of a fee-shifting provision elsewhere in the SPA confirm this conclusion. Therefore, Kuntz is entitled to recover his "reasonable fees and disbursements of legal counsel"[307] for prevailing on his claim for breach of the Tractor Acquisition Covenant.[308]

## D. Damages and Interest

The Sellers are entitled to the $40,000,000 Acceleration Payment (minus bonuses, incentive payments, and fees and expenses due to Cascadia, none of which materialized) for Schneider's breach of the Tractor Acquisition Covenant.[309] Under

---

[307] SPA at 8 (definition of "Losses").

[308] Following oral argument, Kuntz submitted to the court to a recent order issued in *LPPAS Representative, LLC v. ATH Holding Co., LLC*, 2022 WL 94610 (Del. Ch. Jan. 10, 2022), where the court was asked to enforce an indemnification provision. *See* Super. Ct. Dkt. 4. The court ultimately awarded the plaintiff its attorneys' fees under the indemnification provision for reasons unrelated to the issues relevant to this opinion. *See* 2022 WL 94610 at *7. The *LPPAS* decision did not address the *TranSched* line of cases or their applicability to that dispute. Therefore, *LPPAS* does not factor into the analysis here. *See 250 Exec., LLC v. Christina Sch. Dist.*, 2022 WL 588078, at *5 (Del. Ch. Feb. 28, 2022) ("a decision does not provide authority for a subject if the court did not address it at all").

[309] *See* SPA § 2.4(f).

the SPA, Schneider was required to make the Acceleration Payment within five business days of the breach.[310]

Under the Tractor Acquisition Covenant, Schneider was required to provide W&S with 60 growth tractors by the end of each Measurement Period. The first Measurement Period ended on June 30, 2017.[311] Schneider failed to deliver 60 growth tractors by that date. The Acceleration Payment was due five business days later: July 10, 2017. That is also the date upon which pre-judgment interest began to accrue. *See Watkins v. Beatrice Companies, Inc.*, 560 A.2d 1016, 1020 (Del. 1989) ("[t]he general rule is that interest starts on the date when payment should have been made" (internal quotations omitted)); *Beard Research, Inc. v. Kates*, 8 A.3d 573, 620 (Del. Ch.) ("interest is to be awarded from the date payment is due"), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010).

Kuntz has requested, and is entitled to, prejudgment interest.[312] "In Delaware, prejudgment interest is awarded as a matter of right." *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992). Interest begins to accrue from the date payment is due. *Id.* The court has "broad discretion, subject to principles of fairness, in fixing the interest rate to be applied." *Levey v. Browstone Asset Mgt., LP*, 2014

---

[310] *Id.*

[311] *See* PTO, III ¶ 7.

[312] PTO, V.B.4; Def.'s Op. Br. 79–80.

WL 4290192, at *1 (Del. Ch. Aug. 29, 2014) (internal quotations and bracketing omitted). "Unless the parties have specified another rate by contract or the court determines that a different rate is warranted by the equities, the statutory rate of interest governs." *BTG Int'l, Inc. v. Wellstat Therapeutics Corp.*, 2017 WL 4151172, at *21 (Del. Ch. Sept. 19, 2017). The SPA is silent as to any pre- or post-judgment interest rate. The legal rate is 5% above the Federal Reserve discount rate. 6 *Del. C.* § 2301(a). Under the circumstances of this case, interest should be calculated "at the legal rate, compounded quarterly," running from July 10, 2017 to the date of payment, "with the rate of interest fluctuating with changes in the legal rate." *Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, 2018 WL 3326693, at *45 (Del. Ch. July 6, 2018), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019).[313] Kuntz is also entitled to post-judgment interest at the legal rate. *Noranda Aluminum Hldg. Corp. v. XL Ins. Am., Inc.*, 2021 WL 5961628, at *7 (Del. Dec. 16, 2021); 6 *Del. C.* § 2301(a).

## III. CONCLUSION

For the foregoing reasons, judgment is entered for Kuntz for breach of contract in the amount of $40,000,000. Prejudgment interest is awarded beginning July 10, 2017, at the legal rate, compounded quarterly. Post-judgment interest is

---

[313] *See Levey*, 2014 WL 4290192, at *1 ("A fluctuating interest rate adequately reimburses a plaintiff for the loss of use of its capital by replicating the economic circumstances that existed during the litigation.").

awarded at the legal rate, compounded quarterly.  Kuntz is also entitled to an award of his legal fees and expenses.  As the prevailing party, Kuntz is awarded his costs. Ct. Ch. R. 54(d); 10 *Del. C.* § 5106.

Pursuant to Court of Chancery Rule 88, Kuntz shall submit an affidavit in support of his fee and expense award within ten business days of this opinion.

**IT IS SO ORDERED.**